**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SARA LEE CORPORATION,
Plaintiff-Appellant,

v.                                                        No. 94-2562

KAYSER-ROTH CORPORATION,
Defendant-Appellee.

Appeal from the United States District Court
for the Middle District of North Carolina, at Winston-Salem.
Frank W. Bullock Jr., Chief District Judge.
(CA-92-460-6)

Argued: May 4, 1995

Decided: April 17, 1996

Before WIDENER, HALL, and WILKINS, Circuit Judges.

_____

Reversed and remanded with instructions by published opinion. Judge
Hall wrote the majority opinion, in which Judge Wilkins concurred.
Judge Widener wrote a separate dissenting opinion.

_____

**COUNSEL**

**ARGUED:** George Lester Little, Jr., Rodrick John Enns, PETREE
STOCKTON, L.L.P., Winston-Salem, North Carolina, for Appellant.
Alan William Duncan, SMITH, HELMS, MULLISS & MOORE,
L.L.P., Greensboro, North Carolina, for Appellee. **ON BRIEF:** Dan-
iel R. Taylor, Jr., J. David Mayberry, PETREE STOCKTON, L.L.P.,
Winston-Salem, North Carolina, for Appellant. Jonathan A. Berkel-

hammer, SMITH, HELMS, MULLISS & MOORE, L.L.P., Greensboro, North Carolina, for Appellee.

_____

**OPINION**

HALL, Circuit Judge:

Sara Lee Corporation appeals the district court's entry of judgment for Kayser-Roth Corporation in Sara Lee's action for trademark infringement. The district court found that Kayser-Roth's use of the mark Leg Looks**R** on a line of its No nonsense**R** hosiery products sold in food, drug, and mass merchandising outlets did not infringe on Sara Lee's L'eggs**R** trademark. Because the court's finding was clearly erroneous, we reverse its judgment and remand the case with directions to enter judgment for Sara Lee. We further instruct the district court to grant Sara Lee's request that Kayser-Roth be permanently enjoined from using its Leg Looks**R**  trademark in a manner that infringes on the L'eggs**R** mark.

I.

Sara Lee manufactures pantyhose and other hosiery products for retail sale under the Hanes**R** and L'eggs**R** trademarks. Until L'eggs**R** penetrated the "FDM market"**1** in the early 1970s, women's hosiery was sold only in department stores. Sara Lee's most popular L'eggs**R** product is its Sheer Energy**R** line of light support pantyhose, made from nylon and spandex. Sara Lee also manufactures nylon-only products, but its nylon-and-spandex brands account for the largest share of its profits from hosiery sales. Sara Lee dominates the nylon-and-spandex pantyhose market; about three of every four pairs sold are Sheer Energy**R** products.

Kayser-Roth is Sara Lee's only nationwide competitor. It followed Sara Lee into the FDM market in 1973, when it introduced its No nonsense**R** line of pantyhose. In contrast to Sara Lee's, Kayser-Roth's

_____

**1** The FDM market is comprised of food, drug, and mass merchandising (Wal-Mart, K-mart, etc.) outlets.

2

sales of nylon-only products far exceed those of its nylon-and-spandex lines.

Over the last twenty-odd years, Kayser-Roth and Sara Lee have spent hundreds of millions of dollars in advertising their hosiery products. As a result, the companies have reaped billions in sales, and both No nonsense**R** and L'eggs**R** have become household names.

Sara Lee and Kayser-Roth are intense rivals and frequent court opponents. In early 1992, Kayser-Roth learned of Sara Lee's plan to introduce L'eggs Everyday**R**, a new line of nylon-only hosiery. Kayser-Roth decided to respond by simultaneously introducing its own new line of nylon-and-spandex hosiery, designed to be priced lower than Sheer Energy**R**.

The new line required a name. Kayser-Roth had, during the previous summer, applied to the United States Patent and Trademark Office to register the designations "Sheer Vigor" and "Sheer Invigoration." Sara Lee learned of the applications, and it filed the instant suit for declaratory and injunctive relief on July 22, 1992, alleging that Kayser-Roth had violated Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. § 1051 et seq.**2**

_____

**2 See** 15 U.S.C. §§ 1114 and 1125(a). Section 1114 provides that the holder of a registered trademark can pursue certain civil remedies in the district court against

> (1) Any person who shall, without the consent of the registrant--
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
>
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such . . . to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or ser-

3

Kayser-Roth instead marketed its new product as "Leg Looks**R**," a trademark that it already owned. Undaunted, Sara Lee amended its complaint on September 9, 1992, to assert that the name Leg Looks**R** infringed on its L'eggs**R** mark, and that the product's packaging was confusingly similar to the trade dress of its Sheer Energy**R** line. <u>See</u> note 2, <u>supra</u>. Sara Lee also amended its prayer for relief to request money damages. Kayser-Roth counterclaimed, alleging that Sara Lee had engaged in numerous antitrust violations and in false advertising.

The case was assigned to a magistrate, who recommended that Kayser-Roth be preliminarily enjoined from continuing to sell Leg

_____

> vices on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.. . .

Akin to § 1114's protection of trademarks, § 1125(a) proscribes encroachments on a product's "trade dress," which is, at the very least, "the total look of a product and its packaging. .. ." 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 8.01[2] (3d ed. 1995). The statute permits "any person who believes that he or she is likely to be damaged" to file suit against

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin or his or her or another person's goods, services, or commercial activities . . . .

Sara Lee's initial complaint, as well as the amended version it later filed, <u>see</u> text <u>infra</u>, also alleged that Kayser-Roth's actions violated state laws regarding unfair competition, deceptive trade practices, and trademark dilution.

4

Looks**R** as packaged. The district court adopted the magistrate's recommendation; Kayser-Roth thereafter recalled its Leg Looks**R** products and changed the packaging.**3** Kayser-Roth nevertheless continued to affix the Leg Looks**R** mark to its new nylon-and-spandex product.

On January 11, 1993, Sara Lee moved to supplement its amended complaint to reassert all of its federal and state claims as to the repackaged Leg Looks**R** product; in March, it once again moved for a preliminary injunction. The magistrate conducted a ten-day hearing on the motion in August 1993. At the conclusion of the hearing, the parties and the district court agreed, inter alia, that (1) Sara Lee would waive all claims for money damages, (2) Sara Lee's remaining claims for equitable relief would be bifurcated from Kayser-Roth's counterclaims, and (3) the just-concluded hearing would be treated as a trial on the merits of Sara Lee's equitable claims, with the matter referred to the magistrate for decision, subject to de novo review by the district court.**4**

On November 30, 1993, the magistrate issued a report and recommendation; he advised the district court to enter judgment for Sara Lee on all claims. The magistrate recommended that Kayser-Roth be

_____

**3** The Leg Looks**R** packaging used during the latter portion of 1992 indeed bore a close resemblance to that of the Sheer Energy**R** line. The foreground and background colors and the size, slant, and font of the primary lettering were very similar. In addition, both packages were styled with thin, slanted, widely spaced lines, giving an appearance reminiscent of sunlight peeking through Venetian blinds that are not quite closed.

The redesigned packages, introduced in early 1993, have eliminated the lettering and styling similarities. A white, shimmering silhouette of a leg in the kneeling position, dissolving just above the knee, has been emplaced against a black, rectangular field, which is itself centered on a brightly colored background (it appears to be an industry practice that the dominant package color varies within the line itself, depending on the particular product). The No nonsense**R** trademark and the words "invigorating pantyhose" appear more prominently on the new packaging.

**4** Sara Lee's initial claims regarding Kayser-Roth's attempted registration of the Sheer Vigor and Sheer Invigoration trademarks were dismissed without prejudice by the consent of the parties on July 14, 1993.

5

permanently enjoined from using its Leg Looks**R** trademark in the FDM market.**5**

Kayser-Roth objected to the magistrate's report and recommendation. The district court examined the record anew, and, on October 13, 1994, filed an opinion that adopted many of the magistrate's underlying findings, yet disagreed with his conclusions.

The court found, as an initial matter, that Sara Lee's federal trademark claim was foreclosed by the doctrines of laches and acquiescence; it further determined that, even if Sara Lee's trademark claim were not equitably barred, Kayser-Roth's use of the Leg Looks**R** mark did not violate the Lanham Act. The court likewise saw no merit in Sara Lee's claim that Kayser-Roth's marketing of Leg Looks**R** in the redesigned package infringed on the trade dress of Sara Lee's Sheer Energy**R** products.**6** Consequently, the district court entered judgment for Kayser-Roth on all of Sara Lee's claims. Sara Lee appeals.

II.

Although trademark law is imbued with numerous idiosyncracies, the standard governing our review of the district court's findings of fact in a trademark case is familiar. Generally speaking, we may set aside such findings only if they are clearly erroneous, Fed. R. Civ. P. 52(a); Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1526 (4th Cir. 1984). However, we owe no deference to the district court's findings if they are derived as a result of the court's misapplication of the law. Pizzeria Uno at 1526.

_____

**5** The magistrate recommended against enjoining Kayser-Roth from using its Leg Looks**R** mark in department store outlets where it had been used prior to June 1, 1992. See Section III-A, infra.

**6** The district court concluded that its findings in favor of Kayser-Roth on the federal trademark and trade dress claims were dispositive of Sara Lee's unfair competition and deceptive trade practice claims under state law. Lastly, the court held that North Carolina did not recognize the tort of trademark dilution.

6

III.

We must address at the threshold the district court's findings that Sara Lee slept on its rights or, alternatively, that it acquiesced to Kayser-Roth's current use of the Leg Looks**R** mark.

A.

During the 1980s, Kayser-Roth used the Leg Looks **R** mark on a line of "fashion" nylon-only hosiery products in competition with Sara Lee's Hanes**R** line; after peaking in 1985, sales of Leg Looks**R** dropped precipitously throughout the remainder of the decade. In their original incarnation, Leg Looks**R** products were available only in upscale department stores. No L'eggs**R** products have ever been sold in such outlets.

From the outset, the Hanes**R** division kept its corporate master fully apprised of Kayser-Roth's marketing of Leg Looks **R**; nonetheless, Sara Lee has not challenged Kayser-Roth's use of the Leg Looks**R** mark until now. The question before us is whether, as Kayser-Roth asserts, "now" is too late.

In a trademark case, courts may apply the doctrine of estoppel by laches to deny relief to a plaintiff who, though having knowledge of an infringement, has, to the detriment of the defendant, unreasonably delayed in seeking redress. See 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 31.02 (3d ed. 1995) [hereinafter McCarthy] ("Estoppel by laches [is] defined as that type of delay in filing suit which causes prejudice to defendant and when weighed with all other relevant equitable factors, results in a bar to relief, either injunctive or monetary, or both.") (citation and internal quotation marks omitted).**7**

_____

**7** In determining whether laches may operate as a defense to an infringement claim, a court should ordinarily consider (1) whether the owner of the trademark knew of the infringing use, (2) whether the owner's delay in challenging the infringement of the mark was inexcusable or unreasonable, and (3) whether the infringing user has been unduly prejudiced by the owner's delay. Brittingham v. Jenkins, 914 F.2d 447, 456 (4th Cir. 1990).

7

However, the doctrine is sparingly applied where, as here, a plaintiff seeks only equitable relief. See id. at§ 31.03[3][b] (reviewing cases);**8** see also Skippy, Inc. v. CPC Int'l, Inc., 674 F.2d 209, 212 (4th Cir.) ("While the availability of laches as a defense to claims for injunctive relief may be limited . . . laches will bar a claim for damages for bad faith infringement.") (citations omitted), cert. denied, 459 U.S. 969 (1982). Moreover, in consideration of the public interest, estoppel by laches may not be invoked to deny injunctive relief if it is apparent that the infringing use is likely to cause confusion. 4 McCarthy at § 31.04[1]; see University of Pittsburgh v. Champion Products, Inc., 686 F.2d 1040, 1044 (3d Cir.) ("Because laches is an equitable doctrine, its application is inextricably bound up with the nature and quality of the plaintiff's claim on the merits relevant to a prospective injunction."), cert. denied, 459 U.S. 1087 (1982).

_____

**8** According to Professor McCarthy, cases involving the denial of injunctive relief usually present one or more aggravating factors, causing the balance of the equities (which has, at that point, favored the defendant by virtue of the delay-and-prejudice analysis) to shift even further to the defendant's advantage. These factors include (1) delay during which the mark passed into usage as a generic name, (2) a grossly long period of delay, (3) dubious proof of likelihood of confusion, (4) doubt as to the plaintiff's title to the mark, (5) prior business dealings between the parties that result in the plaintiff impliedly consenting to the defendant's infringement, and (6) the defendant's good-faith development of a specific territorial area.

We encountered the fifth of the above factors in Ambrosia Chocolate Co. v. Ambrosia Cake Bakery, Inc., 165 F.2d 693 (4th Cir. 1947), cert. denied, 333 U.S. 882 (1948). In Ambrosia, the chocolate company's sales representative tried to sell the bakery certain ingredients to be used in the manufacture of the latter's cakes. Afterward, the chocolatier's vice-president sent a letter to the bakery, urging that the two companies transact business and noting "that the name `Ambrosia' of your company was the same as ours increased our interest, you may be sure." Id. at 694. Eight years later, the chocolate company finally became interested enough to file suit seeking to enjoin the bakery from further use of the "Ambrosia" trademark. The district court dismissed the complaint, and we affirmed, holding, inter alia, that the suit was barred by "laches, acquiescence, and estoppel. . . ." Id.

8

In finding that Sara Lee was estopped by laches from asserting its infringement claim, the district court failed to consider the relative unavailability of that defense to preclude injunctive relief. In addition, the court did not consider the public interest in avoiding confusion between the L'eggs**R** and Leg Looks **R** trademarks, undoubtedly because, as discussed in Section IV, infra, it miscalculated the likelihood of that confusion. Because the district court either overlooked or misapplied the law governing estoppel by laches, we are constrained to set aside its finding that the doctrine operates to bar the instant suit. See Section II, supra.

We also note that the district court considered, but failed to fully appreciate, the conundrum with which Sara Lee was presented when Kayser-Roth expanded the use of its Leg Looks**R** mark to the FDM market. Because L'eggs**R** hosiery was, then as now, sold exclusively in FDM outlets, it is doubtful that Sara Lee could have proved that its product would likely be confused with Kayser-Roth's. Of course, the likelihood of confusion is the "keystone of infringement." 3 McCarthy § 23.01; see 15 U.S.C. §§ 1114(1), 1125(a)(1), note 2 supra. Indeed, to the extent that a plaintiff's prior knowledge may give rise to the defense of estoppel by laches, such knowledge must be of a pre-existing, infringing use of a mark. See note 7, supra (Brittingham analysis assumes the existence of an infringement for an extended period prior to the commencement of litigation).

The estoppel-by-laches defense arises only where the plaintiff has unreasonably delayed its pursuit of a remedy. See Brittingham, 914 F.2d at 456, and note 7, supra. From the time that Kayser-Roth first introduced its Leg Looks**R** products, Sara Lee has been on the horns of a dilemma:

> If [the trademark owner] waits for substantial injury and evidence of actual confusion, it may be faced with a laches defense. If it rushes immediately into litigation, it may have little or no evidence of actual confusion and real commercial damage, may appear at a psychological disadvantage as "shooting from the hip" and may even face a counterclaim for overly aggressive use of litigation.

4 McCarthy § 31.06[2][c]. We agree with Professor McCarthy that the owner "has no obligation to sue until `the likelihood of confusion

9

looms large.'" Id. at § 31.06[2][a] (quoting Johanna Farms, Inc. v. Citrus Bowl, Inc., 468 F. Supp. 866, 881 (E.D.N.Y. 1978)). Sara Lee, by waiting for Kayser-Roth to expand its use of the Leg Looks**R** mark to the FDM market, chose to delay its pursuit of a remedy until its right to protection had clearly ripened. Under the circumstances, we adjudge its actions to have been entirely reasonable; the district court clearly erred in finding otherwise.

B.

Likewise, the district court's finding that Sara Lee acquiesced in Kayser-Roth's use of the Leg Looks**R** mark in the FDM market is clearly erroneous. The basis for the court's decision was a written agreement between the parties executed on April 30, 1991, in settlement of a dispute over Sara Lee's application with the U.S. Patent and Trademark Office to register "Lingerie Looks" as a trademark for pantyhose. In the document's preface, the parties acknowledged that Kayser-Roth already owned the registered trademarks Leg Looks**R**, Career Looks**R**, Designer Looks**R**, and Silky Looks**R**; the substance of the agreement addressed how Sara Lee's Lingerie Looks products would be packaged and advertised to minimize any infringement on Kayser-Roth's rights.

An infringement action may be barred by the doctrine of estoppel by acquiescence where the owner of the trademark, by conveying to the defendant through affirmative word or deed, expressly or impliedly consents to the infringement. See 4 McCarthy § 31.14[1]; Sweetheart Plastics, Inc. v. Detroit Forming, Inc. , 743 F.2d 1039, 1046 (4th Cir. 1984). Although the doctrines of acquiescence and laches, in the context of trademark law, both connote consent by the owner to an infringing use of his mark, acquiescence implies active consent, while laches implies a merely passive consent. 4 McCarthy at § 31.14[1]; see Sweetheart Plastics at 1046.**9**

_____

**9** Thus, as we implied in Sweetheart Plastics at 1046, our decision in Ambrosia, see note 8, supra, is most accurately classified as an illustration of the estoppel by acquiescence doctrine, even though the Ambrosia court invoked the doctrine of estoppel by laches as an alternative ground for its holding.

10

Sara Lee's entry into the 1991 settlement agreement with Kayser-Roth was, no doubt, an affirmative act. However, just as a pre-existing infringement is a prerequisite to the estoppel-by-laches defense, see Section III-A, supra, estoppel by acquiescence requires that the trademark owner knowingly consent -- albeit actively -- to the defendant's infringing use of the mark. As we discussed in the preceding section, it was by no means clear until 1992 that Sara Lee could adduce persuasive evidence of a likelihood of confusion between its L'eggs**R** trademark and Kayser-Roth's Leg Looks**R** mark.

In any event, it is obvious that the 1991 agreement was intended only to govern Sara Lee's future actions in marketing its Lingerie Looks brand; there is nothing in the agreement that can reasonably be construed to immunize Kayser-Roth from liability for all future uses -- especially infringing uses -- of any of its own marks. Moreover, even if Kayser-Roth's estoppel-by-acquiescence defense were valid, public policy dictates that -- like the doctrine of estoppel by laches -- it not be rigidly applied in cases like this one, where the likelihood of confusion is apparent. See Section III-A, supra; 4 McCarthy § 31.14[1] ("The defense of laches is trumped by a strong showing of likely confusion of the public. Similarly, a strong showing of a likelihood of confusion can trump even a proven case of acquiescence by the senior user to the junior user's usage. . . .").

Accordingly, we reject Kayser-Roth's equitable defenses to the instant suit, and we move on to address the merits of Sara Lee's claims.

IV.

We may grant injunctive relief to the owner of a registered trademark whose rights to the mark have been infringed on by another's use of a copy or colorable imitation that is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C.§ 1114(1); Pizzeria Uno, 747 F.2d at 1527; see also Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 127 (4th Cir. 1990) ("The ultimate question, for purposes of determining liability in trademark infringement actions, is whether there exists a likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply confused, as to the source of the goods in question.") (citations and internal quo-

11

tation marks omitted). The test is likelihood of confusion; evidence of actual confusion is unnecessary. Pizzeria Uno at 1527.

To ascertain the likelihood of confusion between two trademarks, we consider a number of factors. These factors include:

> (1) the distinctiveness of the senior mark;
>
> (2) the similarity of the two marks;
>
> (3) the similarity of the goods or services that the marks identify;
>
> (4) the similarity of the facilities employed by the parties to transact their business;
>
> (5) the similarity of the advertising used by the parties;
>
> (6) the defendant's intent in adopting the same or similar mark; and
>
> (7) actual confusion.

Pizzeria Uno at 1527. Certain factors may not be germane to every situation; moreover, though several factors are simultaneously present, some factors may, depending on the case, be more important than others. Id.; see Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 320 (4th Cir.) (the Pizzeria Uno factors are not meant to be a rigid formula for infringement; they are "only a guide -- a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion."), cert. denied, 113 S. Ct. 206 (1992). Indeed, we have distilled other factors that may be considered relevant to analyzing the likelihood of confusion, such as (8) the quality of the defendant's product, Perini at 127, and (9) the sophistication of the consuming public. Id. ; see Dayton Progress Corp. v. Lane Punch Corp., 917 F.2d 836, 839-40 (4th Cir. 1990). We will consider each factor in turn.

12

A. The Distinctiveness of the Senior Mark

1. Legal Background

The protection accorded trademarks is directly related to the mark's distinctiveness. "Fanciful," "arbitrary," and "suggestive" marks are inherently distinctive, and thus receive the greatest protection against infringement. 1 McCarthy § 11.01[1]. Fanciful marks are, in essence, made-up words expressly coined for serving as a trademark. Some examples of fanciful marks are Clorox **R**, Kodak**R**, Polaroid**R**, and Exxon**R** . Id. at § 11.03[4].

Arbitrary marks are comprised of words in common usage, but, because they do not suggest or describe any quality, ingredient, or characteristic of the goods they serve, are said to have been arbitrarily assigned. Examples include Tea Rose**R** flour, Camel**R** cigarettes, and Apple**R** computers. Id. at§ 11.04[3]. Though tea rose, camel, and apple are -- unlike Clorox**R** andKodak**R** -- words denoting "real" things, they are similar to fanciful marks in that they neither suggest any mental image of the associated product nor describe it in any way.

Suggestive marks connote, without describing, some quality, ingredient, or characteristic of the product. Coppertone**R**, Orange Crush**R**, and Playboy**R** are good examples of suggestive marks because they conjure images of the associated products. Id. at § 11.23. These marks are nevertheless not descriptive; although they are meant to project a favorable or idealistic image with which a prospective user might identify, a person without actual knowledge would have difficulty in ascertaining the nature of the products that the marks represent.

In contrast to fanciful, arbitrary, or suggestive marks, there are marks that are not inherently distinctive. For instance, certain marks merely describe a function, use, characteristic, size, or intended purpose of the product. Examples of such "descriptive" marks include After Tan post-tanning lotion, 5 Minute glue, King Size men's clothing, and the Yellow Pages telephone directory. Id. at § 11.08. Marks that are merely descriptive are accorded protection only if they have acquired a "secondary meaning," that is, if"in the minds of the public, the primary significance of a product feature or term is to identify the

13

source of the product rather than the product itself." <u>Dayton Progress</u> at 839 (quoting <u>Inwood Laboratories v. Ives Laboratories</u>, 456 U.S. 844, 851 n.11 (1982)). Coca-Cola**R** is probably the paradigm of a descriptive mark that has acquired a secondary meaning.

"Generic" terms are the common name of a product or service itself, and can <u>never</u> be trademarks. <u>Perini</u> at 124.**10** Examples of brand names held to be generic terms are Convenient Store retail stores, Dry Ice solid carbon dioxide, Light Beer ale-type beverages, and, in a case where a once-fanciful mark had, over time, been assimilated into the language, Thermos vacuum-insulated bottles. 2 McCarthy § 12.03 (citation omitted).

2. The L'eggs**R** mark

The L'eggs**R** mark was conceived in the midst of Sara Lee's endeavor to discover new ways to manufacture, package, and market women's hosiery. The company's efforts have paid off; by developing a line of nylon-and-spandex hosiery, packaging its products in the now-famous egg-shaped containers,**11** and cultivating a new market in which to sell its goods, Sara Lee has amassed handsome profits.

But what, exactly, does L'eggs**R** mean? The district court decided that L'eggs**R** was a contraction for "leg eggs." It then focused on what it considered to be the "weaker" element of the mark (leg), which, of course, is also an intrinsic part of Kayser-Roth's Leg Looks**R** mark, and almost certainly the source of any confusion between the two.

_____

**10** A mark is generic if it "denominate[s] a type, kind, genus or subcategory of goods." <u>Dayton Progress</u> at 839 (quoting <u>G. Heileman Brewing Co. v. Anheuser-Busch, Inc.</u>, 873 F.2d 985, 997 (7th Cir. 1989)). In other words, a generic term "identifies the general nature of an article." <u>Dayton Progress</u> at 839 (citation and internal quotation marks omitted).

A term may also be generic if it names a "distinctive characteristic of that genus of products." 2 McCarthy § 12.02[5]. For example, the term "Matchbox" was held to be generic because that genus of toy vehicles were sold in matchbox-sized boxes.

**11** Since 1991, Sara Lee has curtailed its packaging of L'eggs**R** products in plastic eggs in favor of more "environmentally friendly" cardboard boxes. Nonetheless, the new packaging retains the egg silhouette.

14

Citing the rule that a term may be generic if it names a distinctive characteristic of the genus to which the product belongs, see note 10, supra, the court concluded that, because all pantyhose have legs, the word "leg" is generic insofar as it pertains to pantyhose. The court alternatively found that "leg" is generic because it is an abbreviation of "legwear" or "leggings," terms that refer to the genus of apparel to which pantyhose belong. According to the district court, because the word "leg" is generic, it may legally be used as part of an otherwise non-infringing pantyhose trademark.

We disagree. The district court failed to appreciate that the mark at issue is neither "leg eggs" nor "legs," but L'eggs**R**, a word that represents a singular concept associated with -- but very different from -- pantyhose. Although the mark may not be wholly fanciful (because it is phonetically identical to a common word) or arbitrary (because it is not actually a "real" word), it is unquestionably suggestive, and therefore a strong, distinctive mark. L'eggs**R** conjures favorable images of attractive legs or legginess, and, by subtly reminding consumers of its famous egg packaging design, reinforces the association between the product and its source -- a sure sign of a mark entitled to protection.**12**

_____

**12** See, e.g., Metro Publishing, Ltd. v. San Jose Mercury News, 987 F.2d 637, 640 (9th Cir. 1993) (a likelihood of confusion exists when consumers "are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques.") (citations and internal quotation marks omitted). It stands to reason that a mark which elucidates, to an unusual degree, the source of a product serves the public interest and should be preserved. That is precisely why merely descriptive marks are accorded trademark protection upon acquiring a secondary meaning. See discussion in Section IV-A(1), supra.

As for the district court's alternative finding, we note simply that L'eggs**R** does not denominate a type or genus of goods, nor does it name a distinctive characteristic of pantyhose in general. See note 10, supra. A different case would be presented if the mark at issue were "Pantyhose" or "Stockings" (type or genus), or "Nylons" (characteristic).

Our conclusion that the L'eggs**R** mark is distinctive is further bolstered by the Patent and Trademark Office's registration of the L'eggs**R** trademark without requiring any proof of the mark's having acquired a secondary meaning. See Pizzeria Uno at 1529:

15

B. The "Similarity" Factors

We now consider briefly the similarity of the two marks, of the goods the marks identify, of the facilities employed to transact the parties' business,[13] and of the advertising used by the parties.

L'eggs**R** and Leg Looks**R** , although not identical, are perceived similarly by the eye and ear. Whether being written or spoken, L'eggs**R** and the first syllable of Leg Looks**R** are quite similar. Moreover, Leg Looks'**R** first syllable stands alone, emphasizing its similarity to L'eggs**R**.

There can be little argument as to the similarity of the goods that the two marks represent (both are associated with women's hosiery), the facilities that the parties employ to transact business (both L'eggs**R** and Leg Looks**R** are distributed in the FDM market, often side-by-side), or the advertising used by Sara Lee and Kayser-Roth (both employ similar media and target the same consumers). Regarding these three factors, there is no substantial difference between the parties that would serve to ameliorate any confusion of their marks.

_____

> The significance of registration without proof of secondary meaning . . . is that the Patent and Trademark Office has "concluded" that the mark or figure was not merely descriptive but suggestive[,] and this essential fact . . . must be considered prima facie correct by a court in considering the validity of a trademark. . .[.] [R]egistration . . . constitutes not only a determination . . . that the term or word is suggestive but also operates to provide prima facie evidence of the registrant's right to use the mark, endowing it with a strong presumption of validity. (citations and internal quotation marks omitted).

Of course, if L'eggs**R** were indeed a generic term, it could not legally be registered as a trademark. The inescapable conclusion is that either the Patent and Trademark Office or the district court has made a mistake; we are convinced that it was the latter.

[13] This factor has also been expressed as the "proximity" of the products. Perini at 127.

16

C. The Defendant's Intent

As we stated in Pizzeria Uno:

> The intent of the defendant is sometimes a major factor in infringement cases. If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion.

Id. at 1535. In other words, we presume that the person who sets out to infringe on another's trademark has more brains than scruples, and will likely succeed. Cf. Osem Food Indus. Ltd. v. Sherwood Foods, Inc., 917 F.2d 161, 165 (4th Cir. 1990):

> When a newcomer to the market copies a competitor's trade dress, its intent must be to benefit from the goodwill of the competitor's customers by getting them to believe that the new product is either the same, or originates from the same source as the product whose trade dress was copied. Logic requires . . . that from such intentional copying arises a presumption that the newcomer is successful and that there is a likelihood of confusion.

In his memorandum opinion, the magistrate concluded that Kayser-Roth intended to infringe on Sara Lee's trademark, pointing to considerable circumstantial evidence in the record supporting a strong inference that, when Kayser-Roth resuscitated its Leg Looks**R** line, it expressly intended to take advantage of the mark's similarity to L'eggs**R** to siphon sales of Sara Lee's products.**14**  The district court, however,

_____

**14** The magistrate cited testimony that one of Kayser-Roth's vice-presidents directed the company's New Products Group to design packaging for its new line that differed from its other No nonsense**R** products. The resultant trade dress was so close to that of Sheer Energy**R** products that the magistrate -- with the approval of the district court -- enjoined its use. See Section I, supra. The same vice-president rejected the

17

found that Kayser-Roth had acted in good faith -- a finding that we may disturb only if it is clearly erroneous. Because we would reach the same result in this case regardless of Kayser-Roth's intent, reviewing the district court's disposition of this complex issue would serve no purpose; we thus decline to do so.

D. Actual Confusion

The record is replete with anecdotal evidence of consumers throughout the nation confusing the L'eggs® and Leg Looks® marks. Six women -- most of whom usually bought L'eggs ® pantyhose -- testified that they had purchased (or, in one case, nearly purchased) a Leg Looks® product under the mistaken impression that it was instead a L'eggs® product. Sara Lee's service merchandisers told the magistrate of many occasions where consumers had approached them in stores, uncertain of the origin of Leg Looks ®.

The service merchandisers also told of massive confusion by store personnel. Included in the record are photographs of in-store advertisements and circulars promoting, variously, "L'eggs Looks," "Legg Looks," and "L'eggs Look" pantyhose.

The anecdotal evidence, standing alone, is nearly overwhelming; indeed, we can but wonder how often the experiences related by the trial witnesses have been repeated -- but not reported -- in stores across the country. Nevertheless, Sara Lee produced additional evidence in the form of surveys that it had conducted, indicating that approximately thirty to forty percent of the consuming public was confused by the similarity of the L'eggs® and Leg Looks® marks. The

_____

Group's recommendation that the new line be called "Active Sensations," insisting instead on the Leg Looks® name. The magistrate also noted that Kayser-Roth initially spent relatively little money to promote Leg Looks®.

In addition, Kayser-Roth evidently accelerated its marketing of Leg Looks® to coincide with Sara Lee's introduction of L'eggs® Everyday. Perhaps most tellingly, there is evidence in the record suggesting that certain Kayser-Roth employees may have purged computer files relating to the development of the Leg Looks® repackaging.

18

district court discounted the survey evidence on the ground that its reliability may have been in question, but even if the true figure were only half of the survey estimate, actual confusion would, in our view, nevertheless exist to a significant degree.**15**

E. The Quality of the Defendant's Product & the Sophistication of the Consuming Public

The two remaining factors, announced in Perini , probably apply with less frequency than the previous seven. Consideration of the quality of the defendant's product is most appropriate in situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods. If a defendant markets a product under a mark similar to that affixed by a competitor to a commodity of like nature but superior manufacture, that the defendant's product is markedly inferior is likely to be highly probative of its reliance on the similarity of the two marks to generate undeserved sales.

Barring an unusual case, buyer sophistication will only be a key factor when the relevant market is not the public at-large. If the typical consumer in the relevant market is sophisticated in the use of -- or possesses an expertise regarding -- a particular product, such sophistication or expertise may be pertinent in determining the likelihood of confusion. Perini at 127-28. The relative sophistication of the market may trump the presence or absence of any other factor. See id. at 128:

_____

**15** We may infer from the case law that survey evidence clearly favors the defendant when it demonstrates a level of confusion much below ten percent. See Henri's Food Products Co., Inc. v. Kraft, Inc., 717 F.2d 352, 358 (7th Cir. 1983). In that case, the court of appeals cited several cases holding that survey evidence indicating ten to twelve percent confusion was sufficient to demonstrate actual confusion. The court, however, concluded that the 7.6% confusion level before it "weighs against infringement." See also Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 400 (8th Cir. 1987) (survey evidence showing confusion level of between ten and eleven percent sufficient to demonstrate actual confusion), cert. denied, 488 U.S. 933 (1988).

19

> The plaintiff claims that lack of consideration of consumer sophistication does not preclude a finding of infringement when every other factor indicates a likelihood of confusion. Yet, we hold that in a market with extremely sophisticated buyers, the likelihood of consumer confusion cannot be presumed on the basis of the similarity in trade name alone.
> . . .

We need not here concern ourselves, however, with either of the two "Perini factors." There is no assertion in the instant proceeding that Kayser-Roth's product is substantially inferior to Sara Lee's, or that persons who buy pantyhose are any more sophisticated about that product than those who comprise the market for other ordinary retail goods.

F. "The Big Picture"

We have previously acknowledged that the distinctiveness of the senior user's mark is "the first and paramount factor" in determining the likelihood of confusion. Pizzeria Uno at 1527. If the strength of the senior mark is the alpha of infringement analysis, then evidence of actual confusion is surely the omega; where the defendant in an infringement case has elected to use a mark similar to that of a competitor's distinctive mark, and, as a result, has actually confused the public, our inquiry ends almost as soon as it begins.

Even if most of the other factors did not indicate-- as they do in this case -- a strong likelihood of confusion, the strength of the L'eggs**R** mark in conjunction with the solid evidence of actual confusion compels us to conclude that Kayser-Roth's current use of its Leg Looks**R** mark is an infringing one.**16** Upon reviewing the district court's find-

_____

**16** Sara Lee has suggested that the use of an infringing mark on product packaging, standing alone, also constitutes a trade dress violation. We have scrutinized Professor McCarthy's treatise as it pertains to trade dress, see note 2, supra, and can find no support for this argument. The magistrate cited M. Kramer Mfg. Co., Inc. v. Andrews, 783 F.2d 421, 427 (4th Cir 1986), as holding that "the brand name is part of the trade dress," Magis. Op. at 119, but we read the cited portion of that case to say only that the plaintiff alleged that the defendant's copying of the brand name violated Section 1125(a).

20

ing to the contrary, we cannot help but be left with a "definite and firm conviction that a mistake has been made." Pizzeria Uno at 1526. The court's finding is clearly erroneous; we are thus constrained to overturn it.

## V.

The judgment of the district court is reversed, and the case is remanded for it to enter judgment for Sara Lee. We further instruct the district court to enter an order permanently enjoining Kayser-Roth from affixing the Leg Looks**R** trademark to any of its products placed in the same channels of distribution as those in which Sara Lee's L'eggs**R** products are currently sold.

REVERSED AND REMANDED WITH INSTRUCTIONS

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

I

The district court denied Sara Lee's request to enjoin Kayser-Roth from using the trademark LEG LOOKS pantyhose in the food, drug, and mass merchandise market. The judgment of the district court was supported by many findings of fact, one of which was based on a contract of settlement between Sara Lee and Kayser-Roth in 1991. Because of that finding of fact, but also otherwise supported, the district court found that Sara Lee had acquiesced in Kayser-Roth's use of the LEG LOOKS mark.

_____

In any event, because Sara Lee's trade dress claim remains alive only insofar as it might serve as an alternative basis for enjoining Kayser-Roth's further infringing use of the Leg Looks**R** mark, our grant of injunctive relief on the ground of trademark infringement effectively moots the trade dress issue. Moreover, our holding in Sara Lee's favor on its primary federal claim renders it unnecessary for us to address its supplemental state law claims; even were Sara Lee to also prevail on its other theories, it would not be entitled to any further relief.

21

The majority concludes that this finding is clearly erroneous because "the 1991 agreement was intended only to govern Sara Lee's future actions in marketing its LINGERIE LOOKS brand." Slip op. at 11.

The agreement in question appears at A.2871 and grew out of Sara Lee's attempt to register the trademark LINGERIE LOOKS in International Class 25. Kayser-Roth objected on the basis that that mark infringed on its registered mark LEG LOOKS and other marks such as Career Looks, Designer Looks and Silky Looks. Sara Lee agreed to comply with specific marketing and advertising practices, in particular that its LINGERIE LOOKS mark would always be used with and have added to it the L'EGGS trademark so that L'EGGS LINGERIE LOOKS would be the dominant trademark usage of Sara Lee. The agreement contained no market restrictions. The district court found that each party remained free to use its respective mark, LEG LOOKS by Kayser-Roth, and L'EGGS LINGERIE LOOKS, by Sara Lee. It found that in the agreement Sara Lee expressly acknowledged Kayser-Roth's ownership of the registration for the LEG LOOKS mark and that such acknowledgement "supports the inference that [Sara Lee] recognized and consented to Defendant's [Kayser-Roth's] entitlement to the whole range of rights legally afforded by such ownership." The district court found that Sara Lee would not have agreed to L'eggs LINGERIE LOOKS by Sara Lee if it thought it would be confused with LEG LOOKS, despite the sharing of the word leg.

The district court found the relevant market to be the national retail pantyhose market and that food, drug, and mass merchandise stores are some of the many outlets used by both parties to distribute pantyhose products in the national market. Sara Lee registered the L'eggs trademark in 1973 for use on ladies' hosiery and pantyhose in International Class 25. Kayser-Roth registered the LEG LOOKS trademark in 1983 for use on ladies' hosiery and pantyhose in International Class 25. The district court reviewed Kayser-Roth's registration of LEG LOOKS and found no limitation to a particular composition or style. It further found that registration of a trademark bestows upon its owner a presumption that the "goods or services will move through all channels of trade suitable for goods or services of that type, and that they reach all purchasers and potential purchasers of them," quoting RE/MAX of America, Inc. v. Realty Mart, Inc. , 207 U.S.P.Q. 960,

22

965 (T.T.A.B. 1980). The district court concluded that Kayser-Roth's registration of LEG LOOKS, which had become incontestible to the extent provided by 15 U.S.C. § 1065, established the presumption that it could distribute pantyhose under the LEG LOOKS mark through all channels suitable for the registered classification. It then found that department stores, mass merchandising stores, off-price outlets, food stores, and drug stores were all such suitable outlets and that both parties had marketed pantyhose in the national pantyhose market, including the food, drug, and mass merchandise market, since the 1970's.

The majority, by confining its reasoning to the food, drug, and mass merchandising market, has not taken into account many or even most of the findings of fact I have just related. Especially, it has not taken into account the district court's finding of fact that:

> Given the functional interchangeability of pantyhose, Plaintiff's successful marketing of L'eggs pantyhose through FDM stores rather than department stores, and defendant's current success with its pricing strategy, it would be unrealistic and flatly incorrect to find that low-cost pantyhose and high-priced pantyhose do not compete in the same market. Cf. Brown Shoe Co., 370 U.S. at 326 (refusal to divide the shoe market according to "price/quality" distinctions). The court, therefore, finds that the relevant market in this case is, and has always been, the national retail pantyhose market.

That error, and the incorrect finding as clearly erroneous of the district court's finding of acquiescence, are two essential weaknesses in the majority opinion.

I am of opinion that the district court's findings of fact are plausible and supported by the evidence. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985).

23

I would affirm the district court's finding that Sara Lee had acquiesced in the defendant's use of the mark LEG LOOKS.

I would also affirm its finding of relevant market.

II

I also do not agree with the majority's view that anecdotal evidence of confusion and likelihood of confusion in this case is "massive" and "nearly overwhelming" and its conclusion that the district court did not consider, or miscalculated the likelihood of, consumer confusion. Confusion or likelihood of confusion is a question of fact not to be disturbed unless clearly erroneous. 3 J. Thomas McCarthy, Trademarks and Unfair Competition § 23.22 (1995). The district court discussed the relevant evidence in detail and gave specific reasons for crediting or discrediting anecdotal evidence, market studies, and expert testimony offered by both parties. This discussion, in fact, occupies 20 pages of the appendix (A.5331-5351).

The district court divided its discussion of the likelihood of confusion into five categories and its conclusion. The categories were (1) strength of the SHEER ENERGY trade dress; (2) similarity of the packages; (3) defendant's intent; (4) similarity of the goods, sales facilities, and advertising; and (5) evidence of actual confusion. The majority opinion takes little or no issue with any of the district court's discussion or fact finding except that with respect to actual confusion, as is illustrated on page 18-19 of the slip opinion, in the part labeled "D. Actual Confusion." on which its holding is based.

The district court, in its consideration of evidence of actual confusion, listed as sub-categories: A. Consumers, B. Store Personnel, C. Misshelving and Misspelling, and D. Mail Intercept Surveys. The majority opinion discusses little or no evidence relevant to these categories and considered by the district court in detail, but bases its decision on the fact that it disagrees with the district court on the weight to be given the survey evidence and the effect to be given the anecdotal evidence. Slip op. at 18-19.

For example, included in the evidence considered by the district court, but not by the majority, is the following:

24

As of the August 1993 hearing, Kayser-Roth had sold over 3.5 million 1993 packages, yet only four consumers testified at the hearing to having bought the 1993 package, believing it contained L'eggs pantyhose, and only one of those believed it contained SHEER ENERGY pantyhose.

The largest proportion of anecdotal evidence of confusion came from plaintiffs' sales merchandisers rather than store personnel, and even with that, plaintiff's employees gave evidence of only 25 encounters with store personnel who asked plaintiffs' employees about the 1993 package.

Between the introduction of the 1993 package and the August 1993 hearing, Sara Lee's sales merchandisers had made at least 800,000 store visits. Even if only 1/4 of those 800,000 visits had coincided with a display of the 1993 package, those 25 encounters would have occurred on barely more than 1/100 of 1% of the visits.

The evidence about misshelving or misspelling came from Sara Lee's employees and included no explanation from those responsible for the errors. Since Kayser-Roth's pantyhose were almost always shelved near Sara Lee's, the district court did not consider a few clerical errors by unidentified store personnel or outside advertisers demonstrative of actual confusion.

With respect to the survey evidence of Sara Lee, the district court did not "accord the proffered results much weight" because of "the selection of an inappropriate controller by Sara Lee." The district court also discounted Sara Lee's surveys because "they insufficiently emulated market conditions." Rather than take issue with that district court finding as to the weight of the evidence, the majority merely cut the result in half and used that arbitrary half-figure in coming to its conclusion.

The majority opinion does not take into account that the district court accorded more weight to Kayser-Roth's survey evidence than

25

it did to Sara Lee's because it had come closer to emulating market conditions and controlling for the effect of color on packages.

The district court in this case, for some 20 pages, analyzed in detail the evidence of likelihood of confusion. The majority dismisses that analysis in one page with little analysis of the same evidence. Slip op. at 18-19. In my opinion, the majority opinion does not state a sufficient basis for its conclusion that the district court's findings were clearly erroneous. Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 857-58 (1982), stated that "[a]n appellate court cannot substitute its interpretation of the evidence for that of the trial court simply because the reviewing court might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent." (Internal quotation omitted.) Yet, I suggest that is just what the majority has done in this case.

III

Whether or not the findings of fact of the district court I have referred to above are clearly erroneous, and even if the findings of fact of the majority are not clearly erroneous, in my opinion the majority erred when it sequestered the use of the word "leg" in connection with the sale and advertising of pantyhose in the food, drug, and mass merchandise market and gave that exclusive use to Sara Lee.

On page 15 of the slip opinion, the holding of the majority is disclosed.

> According to the district court, because the word "leg" is generic, it may legally be used as part of an otherwise non-infringing pantyhose trademark.
>
> We disagree. The district court failed to appreciate that the mark at issue is neither "leg eggs" nor "legs" but L'eggs**R**, a word that represents a singular concept associated with-- but very different from--pantyhose. Although the mark may not be wholly fanciful (because it is phonetically identical

26

to a common word) or arbitrary (because it is not actually a "real" word), it is unquestionably suggestive, and therefore a strong, distinctive mark. L'eggs**R** conjures favorable images of attractive legs or legginess, and, by subtly reminding consumers of its famous egg packaging design, reinforces the association between the product and its source --a sure sign of a mark entitled to protection. (Italics added.)

Thus the majority holds that the word "leg" may not legally be used as part of an otherwise non-infringing pantyhose trademark in connection with the advertising or sale of pantyhose. I suggest that it is simply not possible to advertise or sell pantyhose without the use of the word "leg" and that the decision of the majority, that the use of the word "leg" in connection with the advertising and sale of pantyhose, is the exclusive right of Sara Lee, is error.

In remarkably similar circumstances, the Third Circuit held, in A.J. Canfield Co. v. Honickman, 808 F.2d 291 (3d Cir. 1986), that "chocolate fudge," as used in the name of a drink called "Diet Chocolate Fudge Soda," was generic and was "available to all potential competitors." 808 F.2d at 308. The court reasoned that ". . . if a term is necessary to describe a product characteristic that a competitor has a right to copy, a producer may not effectively preempt competition by claiming that term as its own." 808 F.2d at 305.

Along the same line, the Seventh Circuit, in Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75 (7th Cir.1977), cert. denied, 434 U.S. 1025 (1978), decided that "Light" is a generic or common descriptive term when used with beer. 561 F.2d at 80. In that case, Miller had the registered mark of "LITE" and had sued Heileman, which had incorporated the word "light" in its sales and advertising. Of course, Miller's suit failed. And the court stated that "[a] generic or common descriptive term is one which is commonly used as the name or description of a kind of goods. It cannot become a trademark under any circumstances." 561 F.2d at 79. The Heileman case was followed in Miller Brewing Co. v. Falstaff Brewing Corp., 655 F.2d 5 (1st Cir. 1981), which held that Miller was estopped by Heileman from prosecuting the same kind of a suit against Falstaff. The court relied on the reasoning of Judge Friendly in two cases for the rule which, in my opinion, should be followed here and is as follows:

27

"No matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name." Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976). "The reason is plain enough. To allow trademark protection for generic terms, i.e. terms which describe the genus of goods being sold, even when these have been identified with a first user, would grant the owner of the mark a monopoly since a competitor could not describe his goods as what they are." CES Publishing Corp. v. St. Regis Publications, Inc., 531 F.2d 11, 13 (2d Cir. 1975).

655 F.2d at 8.

I would conclude that the word "leg" is no less generic than the words "chocolate fudge," as used in connection with diet soda, or the word "light," as used with beer. I suggest again that this holding of the majority is error, regardless of whether or not the facts as found by the district court are clearly erroneous. Advertising and selling pantyhose without using the word "leg" just seems to me to be impossible.

IV

In sum, I am of opinion that the majority erred when it decided, either implicitly or expressly, that the holdings of the district court were clearly erroneous with respect to acquiescence, relevant market, and confusion. Absent the fact findings of the majority, which were contrary to those of the district court, the decision of the majority cannot stand.

Even considering for argument, however, that the fact findings of the majority were correct, its holding that the word "leg" is not a generic term is erroneous, I think, and also for that reason, the decision of the majority cannot stand.

I would affirm.

28