The TEACHING COMPANY LIMITED PARTNERSHIP, Plaintiff,

v.

UNAPIX ENTERTAINMENT, INC., Defendant.

No. Civ.A. 99–454–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

March 3, 2000.

Laura Jean Oberbroekling, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Jennifer Carie Holmes, Slevin & Hart, Washington, DC, for Plaintiff.

Michael Patrick Fortkort, Kenyon & Kenyon, Tina Marie Maiolo, Carr Goodson Lee & Warner, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND FINAL JUDGMENT

LEE, District Judge.

This is an action for trademark infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1994). Plaintiff The Teaching Company Limited Partnership ("TTC") filed a three-count Complaint against Defendant Unapix Entertainment, Inc. ("Unapix"), alleging two counts of trademark infringement and one count of unfair competition. The issues presented are: 1) whether TTC has a valid, protectible trademark in the use of "GREAT MINDS of the Western Intellectual Tradition;" and 2) whether Unapix's use of a colorable imitation of the trademark is likely to cause confusion among consumers. For the reasons which follow, the Court holds that the plaintiff TTC has shown by a preponderance of the evidence that it has acquired a trademark in the term "Great Minds" as it relates to its educational audio/video tape products and the defendant Unapix is liable for infringement upon the plaintiff's mark. Pursuant to Federal Rule of Civil Procedure 52(c), the Court renders the following findings of fact and conclusions of law.

### I. Findings of Fact

This Court heard five days of testimony without a jury. Having considered the testimony and demeanor of the witnesses, and weighed all the evidence, the Court renders the following findings of fact.

**The Teaching Company Created a Series of Educational Audio/Video Products Entitled "Great Minds of the Western Intellectual Tradition"**

Plaintiff TTC is a producer of educational audio and video tapes, which feature the lectures of leading college professors from major universities. TTC is a limited partnership organized under the laws of Delaware having a principal place of business in Springfield, Virginia. Defendant Unapix produces audiovisual products, including videotapes, audiotapes, and compact discs. Unapix is a Delaware corporation having a principal place of business in New York, New York.

The mark at issue is "Great Minds of the Western Intellectual Tradition" ("GMWIT"), which is the name of a series of audio/video taped lectures by leading college professors discussing renowned philosophers like Aristotle, Plato and other so-called "great thinkers." The GREAT MINDS series was created in 1992 and included fifty-seven lectures approximately forty-five minutes in length. The series was divided into five parts: 1) Ancient Philosophy and Faith: From Athens to Jerusalem; 2) The Age of Faith to the Age of Reason; 3) The Enlightenment and Its Critics; 4) Philosophy in the Epoch of Ideology; and 5) Modernism and the Age of Analysis. Each subpart includes several audio and video tapes, as well as printed material concerning the lectures and bibliographic information. TTC has never attempted to register the title "Great Minds of the Western Intellectual Tradition."

In 1996, TTC released a second edition of the GMWIT series. The 1996 edition added updates and modifications to the original lectures. The number of lectures increased to seventy. In addition to the five parts of the series, TTC also released selections of lectures in separate sets. These separate selections were also marked with GREAT MINDS. In June 2000, TTC plans to release a new edition of GMWIT, including a new video edition.

Since TTC produced GMWIT in 1992, TTC has continually marketed and sold the GMWIT series. Print advertisements and direct mail advertising are used to generate interest in the series and to create sales of the product. TTC has advertised in the following print media: the New York Times Sunday Book Review section, The Economist, Science News, Time, New York Review of Books, Nation, New Republic, The Sciences, Archaeology,

The Weekly Standard, National Review, Harper's Magazine, World Traveler (Northwest Airlines' in-flight magazine), Biblical Archaeology Review, Foreign Affairs, Chicago Tribune Books, Reason, The Times Literary Supplement, and The Wilson Quarterly. The New York Times Sunday Book Review section has remained one of TTC's most regular advertising outlets for GMWIT.

TTC has spent nearly $700,000 on newspaper and magazine advertising devoted exclusively to the GMWIT series since 1992. Prior to August 1996, TTC spent $300,000 in print advertising solely dedicated to the GMWIT series. TTC has spent over $11 million on direct mail advertising featuring GMWIT along with other products. Over 20 million catalogs offering the GMWIT series have been distributed. Furthermore, TTC has advertised its products on classical radio stations and National Public Radio.

In addition to TTC's advertisements, GMWIT has received gratuitous coverage in newspapers. Morton Kondracke, writing in the New Republic, referred to the GMWIT series as "the widely advertised philosophy lecture tapes produced by the Teaching Company. . . ." Morton Kondracke, *Searching*, THE NEW REPUBLIC, Dec. 21, 1992, at 43. Articles on TTC and the GMWIT series have also appeared in Forbes, the Chicago Tribune, the Princeton Weekly Bulletin, the New York Times, Mirabella, and Success. For example, an article published in Mirabella in February 1993 recounted the author's experience of watching the GMWIT series in its entirety. The author referred to the GMWIT series as "the big kahuna" of TTC's offerings. Tom Bachtell, *Civilization in 10 Easy Tapes*, MIRABELLA, Feb. 1993, at 56.

TTC also employs a variety of channels to distribute its audio and video tapes. TTC's print advertising and catalogs provide 800–numbers for customers to directly order the products. Several bookstore chains, including Barnes & Noble and Crown Books, have sold GMWIT. In addition, TTC has also recently created its own Internet site to promote and increase sales of all of its products, including the GMWIT series.

In terms of profits, the GMWIT series has consistently been one of TTC's top selling products, generating revenues between $500,000 and $1.2 million per year. The audio versions of the GMWIT series sell for approximately $150 a set. When available, the video versions sold for $550 a set, or $150 per part. The video version was intermittently offered at the sale price of $350 for the set. Thus, the GMWIT series generates significant revenues for TTC.

TTC's activities and use of the term "Great Minds" must now be contrasted with the activities of the defendant Unapix.

### Unapix Produces "Great Minds of . . ." Series of Video Tapes and Matching Books

Defendant Unapix is a multimedia company which produces and sells movies, television programs, and home videos. Mr. Timothy Smith helped create Unapix's "Great Minds of . . ." video documentary series. Mr. Smith is currently president of Unapix Docere, a division of Defendant. He created the Unapix series when he worked for a company named IVN Communications, Inc. ("IVN") from May 1995 to January 1996. Mr. Smith conceived of a video series of interviews and data documentaries focused on innovations in science and IVN released the series entitled "Discovering Great Minds of Science" in November 1995. The IVN Discovering Great Minds was co-produced in conjunction with Disney Magazine Publishing, Inc. d/b/a Discover Magazine (hereinafter "Disney").[1] The concept for "Discovering Great Minds of Science" was developed by Mr. Smith. Mr. Smith intended to develop a series of documentaries on various top-

---

1. Pangea Digital Pictures is the IVN internal division involved with producing "Discover-ing Great Minds of Science."

ics. In February 1996, Mr. Smith left IVN because it lacked the resources to develop the "Discovering Great Minds of . . ." video series. Mr. Smith accepted a position with Unapix and began working on the series.

During the planning stage of development, Unapix considered several possible titles for the series, including "Visionaries of . . ." and "Master Minds of. . . ." In August 1996, Unapix settled on "Great Minds of. . . ."

In an effort to avoid any potential conflicts with the prior rights holders, Unapix entered into agreements with Disney under which Disney acquired all of IVN's intellectual property rights in the "Discovering Great Minds of Science" series. Disney granted Unapix a license to exploit this series in return for financial consideration. The Unapix/Disney agreements expressly acknowledged Unapix's intention unilaterally to produce other "Great Minds of . . ." series independent of "Discovering Great Minds of Science," without any obligation to Disney. The Disney–IVN agreement was executed on July 22, 1996. The Disney–Unapix agreement was dated September 20, 1996. Disney paid $50,000 to IVN, and Unapix paid $50,000 to Disney.

During the course of development of the series, Mr. Smith made a judgment about what to call the series of educational videotapes. His consideration of a name for the series warrants discussion.

### Unapix's "Discovering Great Minds" Series and Consideration of "Great Minds of . . ."

To develop the project series, Mr. Smith sought a partner from a major publication or media outlet interested in a joint venture in the promotion and sale of the videos. Unapix selected WGBH as a co-producer and distributor of the series. WGBH was an ideal joint venturer because it is a nationally recognized public televison station with a large following. The promotional plan for the series would involve airing the initial national telecast of the videos on public television with sale of the video offered at the end of each telecast and promotion in public television previews.

Mr. Steve Atlas was the WGBH co-producer of the "Discovering Great Minds of Science" project. On August 14, 1996, when Unapix was considering a name for the video series, Mr. Atlas advised Mr. Smith that he had concerns about the viability of the "Discovering Great Minds . . ." name as he had seen "a lot of ads for 'Great Minds of the Western Intellectual Tradition.'" Mr. Atlas asked Mr. Smith to consider whether GREAT MINDS was the best choice for the Unapix series. Mr. Atlas forwarded to Mr. Smith a copy of a TTC advertisment of the "Great Minds of the Western Intellectual Tradition" audio/video tape series as it appeared in the New York Times Book Review section.

Mr. Smith received the advertisement and Unapix did not investigate TTC's prior use of GREAT MINDS. In his initial deposition, Mr. Smith testified that after receiving the fax from Mr. Atlas, "it didn't bother me much. So I didn't—I might have discussed it with the Business Affairs Office. But, it wasn't like a major concern of ours at the time. I frankly didn't remember it until I was reviewing the records last week." While Mr. Smith did not investigate TTC's use, he informed the President of the company, David Fox, as well as Mr. Herbert Pearlman, the Chairman of the Board of Unapix, of TTC's conflicting use of GREAT MINDS.

On August 17, 1996, the day after speaking with Mr. Atlas, Mr. Smith circulated a memo which stated: "Advertising deadlines are rapidly approaching and we will have to make some key decisions quickly if we want to bring GREAT MINDS to market for direct sales for the Christmas season." Mr. Smith also testified that at the time he learned of TTC's use of GREAT MINDS, he was already "fairly determined" to use the mark.

On or about August 21, 1996, Unapix received a trademark search report that identified the existence of a trademark application filed by IVN in March 1996.

In early September 1996, Unapix advised Disney of the existing trademark application. Disney entered . discussions with IVN regarding the application. On January 16, 1997, IVN assigned to Disney its trademark application and all rights, title, and interest in the mark, and all associated goodwill in exchange for $6,000. On March 7, 1997, Disney assigned to Unapix that same property and Unapix paid Disney $6,000.

Unapix modified and marketed the pre-existing "Discovering Great Minds of Science" series, renaming it "Great Minds of Science." In the fall of 1997, Unapix released its first offerings in the GREAT MINDS series, "Great Minds of Medicine" and "Great Minds of Business," for broadcast on public television stations. In the fall of 1998, Unapix released its "Great Minds of American History" series for cablecast over the History Channel. Unapix's collections retail for about $60 in videotape format and $25 in audiotape format, or for about $19.95 and $14.95 for single videotapes or audiotapes, respectively, within each collection. The running times of the individual tapes vary, ranging from 30–60 minutes, with the longest full collection running six hours.

In late 1995 or early 1996, TTC saw an advertisement in Discover Magazine for a set of videos sold under the name "Discovering Great Minds of Science." TTC ordered a set of the videos. Thomas Rollins, TTC's President and CEO, examined the product packaging and content description. The videos were produced by Pangea Digital Pictures, a division of IVN Communications, Inc. TTC never saw another advertisement or came across any product from this same company. At that time, TTC did not pursue any action regarding this potentially infringing use of the mark.

In November 1995, TTC had its lawyers conduct a search for users of the mark GREAT MINDS. This search did not uncover any relevant users of the mark. In August 1997, in connection with a search of another mark, TTC discovered that an intent-to-use application had been filed for the mark GREAT MINDS with respect to audio and video cassettes. The intent-to-use application had been assigned to Unapix. TTC continued to monitor the status of the application. The mark was published in September 1998. Following publication of the mark, TTC's counsel sent a letter notifying Unapix of its rights in the mark, and demanding that it cease and desist its confusingly similar use. TTC timely filed an opposition to registration of the mark based upon its prior use of the GREAT MINDS mark. The opposition is still pending.

In the fall of 1998, Unapix began significant marketing of the Unapix videos in TTC's channels of trade. In or around November 1998, an advertisement for videos entitled "Great Minds of American History" appeared in American Heritage magazine. The advertisement identified Unapix as the source of these videos. The overall appearance and layout of this advertisement is strikingly. similar to the overall appearance and layout of TTC's print advertisements for the GMWIT series. Mr. Smith testified that he participated in the selection. In December 1998, Unapix began advertising its videos using the GREAT MINDS mark in the New York Times Sunday Book Review section. This advertisement also included an 800–number to call to order the videos. As stated, since 1992, the Book Review section of the New York Times is the most frequently used print advertising vehicle of TTC. Furthermore, Unapix has run full-page ads at least twice in each of the nationally-distributed Discover Magazine, Forbes, Health, and American Heritage. The series, or parts of it, has also appeared in the PBS catalog, Amazon.com, and various web sites. Unapix has maintained a web site at http: //www.greatmindsof.com since 1998.

On April 1, 1999, TTC filed the present action against Unapix, alleging federal unfair competition (Count I), common law trademark infringement (Count II), and common law unfair competition (Count

III). The Complaint alleged that Unapix's use of "Great Minds" in its series of video tapes infringed on TTC's use of the same words in its "Great Minds of the Western Intellectual Tradition" series.

## II. Conclusions of Law

In order to prevail under Section 43(a) of the Lanham Act for trademark infringement and unfair competition, a complainant must demonstrate 1) that it has a valid, protectible trademark; and 2) that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers.[2] *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 930 (4th Cir.1995); *see also* 15 U.S.C. § 1125(a) (1994). While TTC has never registered GREAT MINDS as its trademark, Section 43(a) of the Lanham Act "generally has been construed to protect against trademark, service mark, and trade name infringement even though the mark or name has not been federally registered." *Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.,* 33 F.Supp.2d 488, 494 (E.D.Va.1999) (*quoting Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 124 (4th Cir.1990)). Since TTC has not registered GREAT MINDS, TTC bears the burden of demonstrating that it is entitled to protection under the Lanham Act. *See id.* at 494. To meet this burden, TTC must show that "GREAT MINDS of the Western Intellectual Tradition" is a valid, protectible trademark and that Unapix's use of "GREAT MINDS of" is a colorable imitation of TTC's trademark likely to cause consumer confusion. *See id.*

As a threshold matter, the parties dispute whether GREAT MINDS or "Great Minds of the Western Intellectual Tradition" as used by TTC functioned as a trademark. Unapix contends that TTC never used a title which functioned as a

trademark because Plaintiff never consistently used GREAT MINDS. As argued by Unapix: sometimes GREAT MINDS appeared in small print, Plaintiff always used the complete title "Great Minds of the Western Intellectual Tradition," and Plaintiff never used GREAT MINDS by itself except in one situation.

The Court finds that substantial evidence in the record establishes TTC used GREAT MINDS as a trademark. GREAT MINDS is the dominant element in the full title, "Great Minds of the Western Intellectual Tradition." GREAT MINDS constitutes the first words seen by the consuming public in Plaintiff's full page ads. *See Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1530 (4th Cir.1984) (stating that the court should focus on the dominant word or phrase in a composite word trademark and finding that "Uno" was the dominant word in "Pizzeria Uno"). This phrase standing alone was featured in catalog copy distributed for years to millions of recipients. The phrase was also featured in other advertising materials mailed or published to potential customers, including the newsletter announcing the second edition of the Great Minds products in 1996. Now, the Court will consider the validity of the mark.

### A. Validity of the Mark

On the question of whether the plaintiff has a valid, protectible mark, the degree of protection is "directly related to the mark's distinctiveness." *Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 464 (4th Cir.1996). A plaintiff can show the validity of his mark in two ways: 1) that plaintiff's mark was inherently distinctive; and 2) that even if the plaintiff's mark is not inherently distinctive, the mark has become distinctive by acquiring secondary meaning. *See, e.g., Washington Speakers Bureau,* 33 F.Supp.2d at 494.

**2.** The test for trademark infringement and unfair competition under the Lanham Act is essentially the same as that for common law unfair competition under Virginia law because both address the likelihood of confusion

as to the source of the goods or services involved. *See Lone Star,* 43 F.3d at 930 n. 10 (*citing Food Fair Stores, Inc. v. Lakeland Grocery Corp.,* 301 F.2d 156, 160 (4th Cir.1962)).

"Fanciful," "arbitrary," and "suggestive" marks are inherently distinctive and entitled to the greatest protection against infringement. *See Sara Lee,* 81 F.3d at 464. On the other hand, "descriptive" and "generic" marks are not inherently distinctive. *See id.* In this case, the parties dispute whether GREAT MINDS is a suggestive or descriptive mark.[3] The importance of the distinction between suggestive and descriptive lies in the strength or the weakness of the mark and the nature of protection afforded the trademark owner. *See Pizzeria Uno,* 747 F.2d at 1527. A suggestive mark is strong and presumptively valid whereas a descriptive mark is considered weak and cannot receive trademark protection without proof of secondary meaning. *See id.*

■ Suggestive marks connote some quality, ingredient, or characteristic of a product. *See Sara Lee,* 81 F.3d at 464. However, suggestive marks do not go as far as describing the product. *See id.* They require the consumer to use his or her imagination to reach a conclusion as to the nature of the goods or to connect the mark with the goods. *See Pizzeria Uno,* 747 F.2d at 1528. Examples of suggestive marks are "Coppertone" suntan lotion, "Orange Crush" soda, and Playboy. *See Sara Lee,* 81 F.3d at 464; *see also RFE Industries, Inc. v. SPM Corp.,* 105 F.3d 923, 926 (4th Cir.1997) (holding that the manufacturer's "Popcorn" trademark used to denote popcorn-shaped silver anodes used in electroplating was suggestive, rather than descriptive). A person without knowledge of these products would not

likely know what product these suggestive marks represent. *See Washington Speakers Bureau,* 33 F.Supp.2d at 494. Each conjures images of the product without actually describing it.

■ "Descriptive" marks describe the intended purpose, function, size, desirable characteristic, use, or the nature of the product, or the class of users or end effect upon the user. *See Sara Lee,* 81 F.3d at 464; *see also* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:16 at 11–22 (1999) [hereinafter "MCCARTHY"]. Thus, descriptive marks impart information directly. *See Pizzeria Uno,* 747 F.2d at 1528. Examples of descriptive marks include "5 Minute" glue, "King Size" men's clothing, and the "Yellow Pages" telephone directory.[4] *See Sara Lee,* 81 F.3d at 464. Each of these marks actually describe a characteristic of the respective product. Descriptive marks are not inherently distinctive because they do not inherently identify a particular source. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). However, descriptive marks may acquire distinctiveness. *See id.* This acquired distinctiveness is "secondary meaning." As stated, descriptive marks receive protection only if they acquire secondary meaning. *See Sara Lee,* 81 F.3d at 464.

TTC argues that GREAT MINDS and GMWIT serve as suggestive marks because without knowing more about the product than its name, the consumer does

---

**3.** There is no argument that GREAT MINDS or "Great Minds of the Western Intellectual Tradition" are fanciful or arbitrary marks. "Fanciful" marks are made-up words expressly designed to serve as a trademark, such as "Kodak" or "Exxon." *See Sara Lee,* 81 F.3d at 464. Arbitrary marks are comprised of real words, which do not describe any characteristic and are not normally associated together, such as "Apple" computers or "Camel" cigarettes. *See id.* Likewise, neither GREAT MINDS nor GMWIT are generic marks. "Generic" terms are the common names of the products or services themselves. *See id.* Thus, they are never trademarks. *See*

*id.* Convenient Store retail stores and Light Beer beverages are examples of generic terms. *See id.*

**4.** The following marks have also been held to be descriptive: CHAP STICK skin preparation in a stick, CONTINUOUS PROGRESS educational materials, FOOD FAIR supermarket, NO SPOT car wash system, OFF THE RACK men's store, POCKET BOOK paperback books, RICH 'N CHIPS chocolate chip cookies, and WORLD BOOK encyclopedia. 2 MCCARTHY § 11:24 at 11–32, 33, 37, 38, 39, 42.

not know (and cannot know) what the product is. The marks are used on video and audio tapes of presentations by leading lecturers discussing the influential · ideas of our time and the individuals who originated them. According to TTC, the marks are not descriptive of the medium used (tapes) or of these presentations. While TTC admits the titles do tell the consumer something about the product, it submits that the message is suggestive.

On the other hand, Unapix contends that both titles are descriptive. GMWIT, taken in its entirety, simply describes the subject matter of TTC's course. According to Unapix, someone who purchases TTC's product is buying the teachings of these "great minds" as related by modern-day scholars; consequently, the mark is indicative of the general nature of the product. The product cannot be considered suggestive because it describes the course in a manner readily understandable to the consumer. *See Washington Speakers Bureau*, 33 F.Supp.2d at 495. Unapix relies on TTC's president's statement that the title was chosen because it was an accurate description of the course's content.

Series titles can function as trademarks. For magazine, newspaper, radio, and television series, the title of the series indicates the source of the product. Several courts have treated non-descriptive series titles as suggestive and not requiring proof of secondary meaning. *See Atlantic Monthly Co. v. Frederick Ungar Pub. Co.*, 197 F.Supp. 524, 529 (S.D.N.Y.1961) (*holding* that ATLANTIC for monthly magazine and books was not descriptive); *see also C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 17 (2d Cir. 1985) (holding that CLASS, the title for a magazine about black culture was not descriptive of the magazine's contents); *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 376–77 (S.D.N.Y. 1985) (*holding* that MARCH OF TIME was not descriptive for newsreel series). However, a number of series titles have been held to be descriptive: ALASKA magazine, AMERICAN COUNTRY COUNTDOWN radio show, COMMUTE CLUB radio and television series, CLASSROOM magazine, FANTASTIC FILMS magazine, and YOUR DOLLAR'S WORTH radio series. *See* 2 MᶜCARTHY § 10:8 at 10–14, 15, 18.

■ The Court finds that GREAT MINDS and GMWIT are suggestive marks. If the consumer had no knowledge about the product other than the name, he or she would not know more about the product. Consumers are required to use their imagination to discern that GREAT MINDS is a video or audio product which features lecturers discussing profound ideas espoused by intellectual innovators. GREAT MINDS and GMWIT conjure images of the product without actually describing it. "If the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness." *Id.* § 11:67 at 11–111 (footnote omitted). In considering GREAT MINDS alone or in connection with the larger title, the consumer must use his imagination to connect great minds to leading thinkers, connect the thinkers to others discussing them, and to finally connect the words to TTC's product: audio and visual tapes which feature professors discussing leading thinkers in the particular field. As stated by TTC President, Mr. Rollins, "[i]t is suggestive of grandeur, of genius, of great sweep as well as of the philosophers and scientists and theologians and others covered by the series."

The fact that GREAT MINDS is subject to several interpretations indicates that consumers are required to use their imagination. GMWIT could contain the actual works of the "great minds," rather than discussions about them. Or, the product could display the "great minds" themselves rather than presenters discussing their works and thoughts. In fact, even Unapix's product is a documentary of the individual. A consumer could also reasonably conclude that the product consisted of biographies of great thinkers. Finally, as one respondent in Robert N. Reitter's

study thought, the course could also be about what causes the brain to work in a way that makes a mind great, rather than the thoughts of those who were great. *See Def.'s Trial Ex.* 293.

A title which tells consumers something about the contents of a product is not, for that reason alone, descriptive for trademark purposes. In permitting registration of the title "Code & Symbol" as a trademark for a trade magazine whose contents included articles about product codes and symbols, the Trademark Trial and Appeals Board observed that:

> A certain degree of flexibility and an understanding of the commercial realities of both the publishing business and of the business or industry to which a particular publication is directed are very helpful in making the necessarily subjective decision whether a particular title qualifies as a valid trademark. From the publisher's point of view, it is important to select a title, especially for a trade or technical journal, that conveys some idea of the subject matter of the contents; without at least a suggestive title, it would be hard for the publisher to reach and interest the relatively small (as compared to the general population) number of potential subscribers. From the point of view of competitors of the publisher, it is important not to grant, by way of a trademark registration, rights so broad and encompassing as to render unavailable, at least without the threat or possibility of litigation, the most apt or the only appropriate words to describe a journal's contents.

*In re Distribution Codes, Inc.,* 1978 WL 21246, 199 U.S.P.Q. 508, 511 (Trademark Tr. & App. Bd.1978). Here, the phrases "GREAT MINDS" and "Great Minds of the Western Intellectual Tradition" tell consumers something about the product, but do so in a suggestive manner. On the other side of the balance, permitting trademark protection of this phrase does not unduly limit the ability of third parties to name competing products, but simply prevents parties like Defendant from selecting

titles likely to create confusion in the marketplace.

In determining whether a mark is suggestive or descriptive, courts give due respect to the determination of the Patent and Trademark Office ("PTO"), which necessarily decides whether a mark is suggestive or descriptive. *See Lone Star,* 43 F.3d at 934. The PTO requires applicants with descriptive marks to prove that the marks have secondary meaning before it grants registration. On the other hand, the PTO grants registration of suggestive marks without the required showing of secondary meaning. In the Fourth Circuit, the determination of the PTO is prima facie evidence of whether the mark is descriptive or suggestive. *See RFE Industries,* 105 F.3d at 926; *see also Lone Star,* 43 F.3d at 936 n. 15; *Sara Lee,* 81 F.3d at 465 n. 12; *Pizzeria Uno Corp.,* 747 F.2d at 1529. However, this determination is not conclusive. *See Petro Stopping Centers, LP v. James River Petroleum, Inc.,* 130 F.3d 88, 93 (4th Cir.1997) (upholding the trial court's finding of descriptiveness which was contrary to the PTO position).

■ In this case, the PTO has reviewed the GREAT MINDS mark three times in connection with the intent-to-use applications presented by Unapix. Each time, the PTO determined that the mark is inherently distinctive. Specifically, the Patent and Trademark Office has determined that use of the phrase "GREAT MINDS" in connection with television programs or audio or video tape presentations "featuring information about famous persons in various fields, professions and disciplines ..." is not descriptive. *Def.'s Trial Exs. 281, 282, 283.* The fact that Unapix filed these applications is not relevant. Since the GREAT MINDS mark is inherently distinctive, it follows that TTC owned rights to a valid mark beginning in 1992.

Unapix contends that the Court should not be persuaded by the determination of the examining attorney because he only

issued the mark for publication, and not for registration. However, the Court finds that the fact the intent-to-use applications have not made it all the way through the process to final registration does not affect the analysis. Each of the three Unapix applications has been published for opposition following examination by a PTO examining attorney. The PTO's TRADE-MARK MANUAL OF EXAMINING PROCEDURE ("TMEP") clearly requires examining attorneys to consider and reject intent-to-use applications for descriptive marks in the course of making their initial examination of such applications.[5] Additionally, the Federal Circuit has stated that intent-to-use applications must be reviewed for descriptiveness as part of the review process. *See Eastman Kodak Co. v. Bell & Howell Document Management Products Co.*, 994 F.2d 1569, 1572 (Fed. Cir.1993) ("Congress intended most marks applied for in an intent-to-use application (intent-to-use mark) to be reviewed for descriptiveness in the initial examination/pre-use stage of the intent-to-use application process.") (*citing* S.Rep. No. 100–515, at 32 (1988)). Thus, the Court is persuaded by the PTO's determination that GREAT MINDS is inherently distinctive.

 Even if the Court found the mark to be descriptive, the Court finds that TTC has established ownership of a valid mark because GREAT MINDS has acquired secondary meaning. Secondary meaning is where "in the minds of the public, the primary significance of a product feature or term is to identify the source of the

product rather than the product itself." *Sara Lee*, 81 F.3d at 464 (citation omitted). In other words, the mark is identified with a particular business instead of what the word normally describes. *See Perini Corp.*, 915 F.2d at 125 (finding that a construction firm had established secondary meaning in its descriptive surname "Perini" where it worked on numerous projects in the region, was nationally ranked, had a volume of sales which exceeded $100 million, and had enjoyed free publicity on a national basis). Secondary meaning is "[t]he power of a name ... to symbolize a particular business." *Id.* (*citing Ideal Toy Corp. v. Kenner Products Div. of General Mills Fun Group, Inc.*, 443 F.Supp. 291, 305 n. 14 (S.D.N.Y.1977)).

 In determining whether there is secondary meaning, the Court should consider several factors: 1) advertising expenditures; 2) consumer studies linking the mark to a source; 3) sales success; 4) unsolicited media coverage of the product; 5) attempts to plagiarize the mark; and 6) the length and exclusivity of the mark's use. *See id.; see also Thompson Medical Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir.1985); *Washington Speakers Bureau*, 33 F.Supp.2d at 496 (finding that Washington Speakers Bureau had established secondary meaning where they had spent millions of dollars on advertising, booked over four thousand speeches each year for many consecutive years, received unsolicited media coverage, and achieved prominence in the speaking engagement industry).

---

5. The manual states:

> To the fullest extent possible, the examining attorney will examine the intent-to-use application for registrability under Trademark Act §§ 1, 2(a), 2(b), 2(c) and 2(e), 15 U.S.C. §§ 1051 and 1052(a), (b), (c) and (e), according to the same procedures and standards which apply to any other application. That is, the examining attorney must make all appropriate refusals with respect to such issues as ownership, deceptiveness, *mere descriptiveness* and surname significance. The examining attorney should investigate all possible issues regarding registrability

> under these sections through all available sources.... The examining attorney must raise all possible issues under these sections in the initial examination of the application. As discussed more fully in TMEP § 1105.05(f) *et seq.*, Office policy precludes the issuance of a requirement or refusal during examination of the statement of use if the issue could or should have been treated in the initial examination, unless the failure to do so constitutes a clear error. TRADEMARK MANUAL OF EXAMINING PROCEDURE, § 1105.01(a)(iv) (emphasis added).

■ As proof of secondary meaning, TTC relies on its continuous use of GREAT MINDS and GMWIT since 1992, advertising costs, sales profits, and extensive media coverage. On the other hand, Unapix contends that TTC fails to offer persuasive evidence supporting the notion that consumers associate the phrase GREAT MINDS with either TTC specifically, or with a nameless company that sells GMWIT. Unapix argues that the advertising expenditures and sales figures which TTC relies on are not substantial amounts on an annual basis, or on an aggregated basis prior to Unapix's use of GREAT MINDS. Unapix submits that TTC has not shown that it acquired secondary meaning prior to Unapix's use of the term. *See* 2 McCARTHY § 10–13 at 10–26 n. 4; *see id.* § 16–34.

Applying the factors, the Court finds that GREAT MINDS enjoys secondary meaning. First, it is undisputed that TTC has used the GREAT MINDS mark without interruption since 1992. While TTC does not currently offer the video version, it is still actively marketing its audio tapes and plans to release the video edition in 2000. Second, TTC has spent approximately $700,000 on 169 full-page ads in major publications promoting its GREAT MINDS product.[6] Additionally, TTC has spent more than $11 million mailing over 20 million catalogs and other literature to millions of persons across the country. These catalogs prominently feature GMWIT. TTC's advertisements and mailings make prominent use of the GREAT MINDS mark. Third, TTC has sold significant amounts of the products with the GREAT MINDS mark. Since 1992, over $6 million of video and audio tapes with the GREAT MINDS mark have been sold. Fourth, TTC has received extensive unsolicited media coverage for the GREAT MINDS products. In several instances, the media coverage used the alleged trademark, GREAT MINDS, to reference the product. Such media coverage illustrates the nexus between the mark and the source, as is required for secondary meaning. *See Devan Designs Inc. v. Palliser Furniture Corp.*, 1992 WL 511694, 25 U.S.P.Q.2d 1991, 1998 (M.D.N.C.1992). Thus, TTC has a valid protectible mark in GREAT MINDS and GMWIT.

### B. Likelihood of Confusion

■ As stated, in order to recover for trademark infringement, the plaintiff must also demonstrate that the defendant's use of the mark is likely to cause confusion. *See Pizzeria Uno*, 747 F.2d at 1527. In making this determination, the court must consider several factors: 1) the strength or distinctiveness of the mark; 2) the similarity of the two marks; 3) the similarity of the products the marks identify; 4) the similarity of the facilities and the trade channels used to market the product; 5) the similarity of advertising used by the parties; 6) the defendant's intent in adopting its same or similar mark; and 7) actual confusion. *See id.* Additional factors that may be considered are: (8) the quality of the defendant's product; and (9) the sophistication of the relevant group of consumers. *See Perini*, 915 F.2d at 127 (stating that the sophistication and expertise of the usual purchasers can preclude any likelihood of confusion among them stemming from the similarity of trade names). While several factors affect the issue of likelihood of confusion, not all of the factors are always relevant or equally emphasized in each case. *See Pizzeria Uno*, 747 F.2d at 1527.

---

**6.** While Unapix suggests that such levels are not sufficient, courts have found secondary meaning based upon much lower advertising expenditures. *See, e.g., George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1536 (2d Cir.1992) (finding secondary meaning based upon $75,000 in advertising over four years); *In re Hehr Mfg. Co.*, 47 C.C.P.A. 1116, 279 F.2d 526, 528 (Cust. & Pat.App.1960) (finding secondary meaning based upon $112,000 in general advertising expenditures, of which $30,000 directly attributable to the alleged trademark, over ten years); *Application of Hollywood Brands, Inc.*, 41 C.C.P.A. 1001, 214 F.2d 139, 141 (C.C.P.A.1954) (finding secondary meaning based upon $1,153,000 in general advertising over six years with about one-third directed to the alleged trademark).

### 1. Strength or distinctiveness of the mark

The first factor concerns the strength or distinctiveness of the mark. Even if the mark is valid and protectible, it may be so weak that the public is not likely to be confused by the use of a similar mark on other goods and services. *See Lone Star,* 43 F.3d at 935. The Court has found that the GREAT MINDS mark is suggestive. *See* discussion, *supra.* Suggestive marks are considered to be strong and entitled to the greatest protection against infringement. *See Pizzeria Uno,* 747 F.2d at 1527. As articulated by the Fourth Circuit, "a suggestive mark will ordinarily be protected against the use of the same or a confusingly similar mark on the same product, or related products, and even on those which may be considered by some to be unrelated but which the public is likely to assume emanate from the trade mark [sic] owner." *Id.* at 1527 (citation and internal quotation omitted). In this case, TTC's and Unapix's products are similar in that they are educational audio and video tapes featuring influential thinkers in a particular field.

Alternatively, the Court has found that even if GREAT MINDS was a descriptive mark, TTC has established secondary meaning. Descriptive marks "are usually enforced only against closely similar marks which are used on virtually identical products." *See id.* (citation omitted). While Unapix has presented evidence of the phrase GREAT MINDS being used with books, greeting cards, etc., those products are not in the same genre as those at issue. In this case, both parties produce high quality educational audio and video tapes bearing the name GREAT MINDS. Thus, this factor weighs in favor of finding likelihood of confusion.

### 2. Similarity of the two marks

The parties dispute whether TTC's and Unapix's use of GREAT MINDS is similar and likely to cause consumer confusion. TTC focuses on the fact that "GREAT MINDS" is the dominant portion of both parties' mark. TTC's product is generally sold by reference to "Great Minds of the Western Intellectual Tradition." However, TTC's product is referred to by the consumer and in publications as "Great Minds." Defendant Unapix's product is generally sold by reference to "Great Minds of...." Thus, TTC submits that Unapix uses the identical GREAT MINDS mark. On the other hand, Unapix argues that similarity of the marks inquiry requires the Court to analyze a mark as a whole as it is actually used in commerce. *See Washington Speakers Bureau,* 33 F.Supp.2d at 498.

The issue of confusion requires consideration of the composite-word trademark. *See Pizzeria Uno,* 747 F.2d at 1530. In considering the validity of a mark where multiple words are used, the Court must consider the context of the words. While a composite term is to be considered in its entirety in determining the *validity* of a trademark, the dominant part of the mark may be given extra weight on the issue of *likelihood of confusion. See id.* In *Pizzeria Uno,* the Court found that the dominant word in the plaintiff's mark "Pizzeria Uno" and the defendant's mark "Taco Uno" was the word "Uno." *See id.* at 1533. The Court concluded that the similarity of the marks gives rise to a likelihood of confusion between the two. *See id.* at 1535. The Court reasoned that the identity of the dominant term in both marks was a strong indicator of that similarity in appearance and sound which would result in confusion for the purposes of trademark infringement. *See id.* at 1534.

In this case, GREAT MINDS is the dominant portion of TTC's "GREAT MINDS of the Western Intellectual Tradition" and Unapix's "GREAT MINDS of Medicine," "GREAT MINDS of American History," etc. The dominant portion of each mark is identical. GREAT MINDS is located at the beginning of each mark. Although in their entirety the disputed marks are not identical, TTC's and Unapix's marks sound and appear extremely similar. Thus, this factor weighs in favor

of finding an overall likelihood of confusion.

### 3. Similarity of the products the marks identify

The third factor in the likelihood of confusion analysis is the similarity between the products offered by TTC and Unapix. Both companies produce and market video and audio tapes on educational topics. While the subjects covered by each tape may be different, the goods themselves are the same. The Fourth Circuit focuses on whether the goods serve the same purpose and if the purposes are related. *See, e.g., Pizzeria Uno,* 747 F.2d at 1535 (finding that the plaintiff's Mexican fast food restaurant and the defendant's sit-down Italian restaurant were both designed to serve the same purpose). *See also In re Hyper Shoppes (Ohio), Inc.,* 837 F.2d 463, 464 (Fed.Cir.1988) (finding that a furniture store is considered similar to general merchandise stores). The Court has refrained from engaging in a searching analysis to reveal some differences between the products. Instead, in *Pizzeria Uno,* the Court reasoned that, although one was a sit-down Italian operation and the other was a Mexican fast food place, both parties operated restaurants and were in food service. 747 F.2d at 1535.

The Court finds that the subtle differences between TTC's and Unapix's products are insignificant. While Unapix's videos are documentaries and TTC's videos are taped lectures, TTC and Unapix sell video and audio tapes providing non-fiction information regarding influential thinkers and the substance of their views. Both Unapix and TTC prominently feature the mark GREAT MINDS in their advertising. Both companies' ads prominently promise an intellectually satisfying presentation of important thinkers and their ideas. Thus, the products are highly similar. *See Pizzeria Uno,* 747 F.2d at 1534.

### 4. Similarity of the facilities/channels of trade

Factor four requires the Court to consider the similarity between the parties' facilities and trade channels. TTC's GREAT MINDS series and Unapix's videos use the same trade channels. Both advertise in well-known national circulation magazines. In fact, both parties have published ads in the very same publications, such as the New York Times Book Review section and American Heritage magazine. Additionally, both parties advertise on the Internet. Both products are advertised in catalogs which are mailed directly to potential customers and contain an order form and provide a toll free 800-number to buy the product. Therefore, the similarity of retail and sales channels shows a likelihood of confusion.

### 5. Similarity of advertising

The fifth factor that the Court must consider is the similarity of advertising. Both TTC and Unapix advertise their respective products to the general public via print media. The products are both advertised in leading publications devoted to intellectual, social, political, and cultural topics. Thus, the number of consumers who could encounter both parties' advertisements is great. In fact, the products have been advertised within weeks of each other in the same publication, the New York Times Book Review section. The New York Times Book Review section has remained one of TTC's most regular advertising outlets since 1992. *See Pizzeria Uno,* 747 F.2d at 1535 (finding that identical media used for advertising is strong evidence of likelihood of confusion). Finally, even the layout and manner of presentation in the Unapix advertising of its products is confusingly similar to that of TTC's GMWIT series.

### 6. Defendant's intent in adopting its same or similar mark

The Court must consider the defendant's intent in adopting the same or similar mark. Unapix admits that it learned of TTC's use of GREAT MINDS as of August 1996. On August 14, 1996, Mr. Steve Atlas called Mr. Smith, Unapix's represen-

tative, and stated that he had seen several of TTC's GREAT MINDS ads. At that time, Mr. Atlas questioned whether the title "Great Minds of" was the best choice for the series. Mr. Smith testified that he was not the least bit concerned about infringing TTC's rights because the products were so different: TTC's product is like a college-level course, in comparison to Unapix's product, which he considers is more like a "60 Minutes" format. However, Mr. Smith was concerned about the possible trademark problems because following Mr. Atlas's call, he immediately informed the president and chairman of the board of Unapix of TTC's prior use of GREAT MINDS. He also consulted with Unapix's outside counsel, Mr. Reichman. Based on these actions, the Court finds that Mr. Smith was aware of the potential trademark infringement implications of TTC's use of GREAT MINDS, and he decided to select the words "Great Minds of" title notwithstanding the similarities between the marks. Unapix did not investigate who, as between TTC and Unapix, was the senior user of the mark.

The law provides that a junior user of a mark has an affirmative duty to select a mark that is not confusing. *See* 3 McCarthy § 23–65 at 23–149, 150. When a defendant adopts a mark with full knowledge of the plaintiff's mark, intent is inferred. *See Beer Nuts, Inc. v. Clover Club Foods, Co.,* 805 F.2d 920, 927–28 (10th Cir.1986) (stating that a deliberate adoption of a similar mark supports a finding of a likelihood of confusion). Therefore, Unapix's selection of the GREAT MINDS mark, with knowledge of TTC's prior use, favors a finding of a likelihood of confusion. On the whole, the Court finds that the evidence is indicative of intentional copying of the GREAT MINDS mark, or at least willful and reckless indifference to the rights of TTC.

The Court is unpersuaded by Unapix's contention that it relied upon the advice of counsel in using the mark GREAT MINDS and did not act with knowledge and intent. "[C]ounsel's opinion is not properly founded and of no professional value" where full and accurate disclosures have not been made. *See Cuisinarts v. Robot–Coupe Int'l Corp.,* 580 F.Supp. 634, 638 (S.D.N.Y. 1984). In this case, Unapix conducted no factual investigation of its own and disclosed virtually none of the facts necessary for Attorney Reichman to render properly founded advice. Mr. Reichman admitted that he knew few of the details concerning TTC's and Unapix's products. He was not apprised of the channels of trade for the distribution of Unapix's video and audio products, and he did not review Unapix advertisements. Mr. Reichman's own investigation was limited to review of admittedly incomplete trademark search reports, which provided no factual information about the actual scope of use of the GREAT MINDS mark in the marketplace. Mr. Reichman's telephone consultations with Unapix were very brief and Unapix did not fully disclose the facts known to it—that the TTC product was similar and being sold in the same advertising channels. Mr. Reichman did not provide a written opinion of counsel and Unapix did not request substantive consideration of their rights and liabilities contrasted with TTC. Thus, Mr. Reichman's advice was without a sufficient foundation and Unapix did not reasonably rely upon it, as Mr. Smith had made up his mind to proceed with the name choice prior to consulting his lawyer. Unapix's course of conduct in consulting its attorney fell short of its duty as a junior user to adequately investigate the rights of a senior user and refrain from adopting a confusingly similar mark.

### 7. *Evidence of confusion*

The law does not require the plaintiff to prove actual confusion. *See Pizzeria Uno,* 747 F.2d at 1527. The plaintiff must only demonstrate a likelihood of confusion. *See id.* In this case, TTC provides expert evidence of the likelihood of confusion. Dr. Jacob Jacoby, a professor of Consumer Behavior and Re-

tail Management at the Leonard Stern School of Business, New York University, conducted a consumer survey to determine the likelihood of confusion created by Unapix's use of GREAT MINDS. The results indicated that approximately sixteen percent of those surveyed were confused (net of control confusion) based on the common name of the products after they were presented with an actual specimen of a TTC advertisement of GMWIT and an actual advertisement for the Unapix GREAT MINDS products. This survey evidence supports a finding of a likelihood of confusion under Section 43(a) of the Lanham Act. *See, e.g., Sara Lee,* 81 F.3d at 467 n. 15 (stating that survey evidence showing a level of confusion between ten and eleven percent is sufficient to demonstrate actual confusion) (citing *Mutual of Omaha Ins. Co. v. Novak,* 836 F.2d 397, 400 (8th Cir. 1987)).

Unapix presented an expert, Mr. Al Ossip, to dispute the results of Dr. Jacoby's survey. Primarily, Unapix contends that Dr. Jacoby's survey design was biased in that a key question in the survey is leading. Dr. Jacoby's question inquired

> If you have any thoughts about it, is there, or isn't there, anything in any of these items that makes you think one or more of the products they advertise comes from the same company that put out the tapes shown in ad ____, the ad you looked at earlier?

Study of Dr. Jacob Jacoby, Audio/Video Materials (Main Questionnaire), Question 2a (1999).

The Court finds that this question is not leading, but rather is equally balanced. There are three possible responses: no thoughts on the question ("If you have any thoughts about it"); an affirmative response ("is there"); and a negative response ("or isn't there"). The question does not intimate that GREAT MINDS provides the basis for the participant's response. The question is designed to elicit a general response. Furthermore, Unapix fails to identify any aspect of the follow-up,

open ended question which suggests association based on name.

Although Defendant presented an expert to challenge Dr. Jacoby's results, Mr. Ossip acknowledged that the best way to determine whether the alleged design flaws he identified had any effect on the outcome would be to conduct an alternate survey. However, Unapix did not present any alternative survey. When questioned about Unapix's failure to conduct its own survey, Mr. Ossip suggested that time and financial limitations did not permit it. However, Unapix had ample opportunity to conduct a "proper" survey on likelihood of confusion, since it had completed a survey purportedly addressing secondary meaning by the end of July.

In a further attempt to discredit TTC's survey, Unapix offered alternative tabulations of Dr. Jacoby's report by purportedly demonstrating low levels of confusion. Mr. Ossip's alternative calculations do not persuade the Court that the likelihood of confusion is lower than that found in the Jacoby survey. Mr. Ossip recalculates Dr. Jacoby's confusion percentages by totaling all of the responses to the survey indicating that respondents believed that the two products in question come from a common source. However, Mr. Ossip's calculations fail to take into consideration the basis for the participant's answer. Mr. Ossip's approach is inconsistent with his earlier criticism that Dr. Jacoby's survey design allegedly produced trivial and irrelevant responses indicating confusion over a common source or business relationship. If, as Mr. Ossip elsewhere contends, Question 2a encouraged positive responses, it is all the more important to analyze the specific reasons given for such general answers in order to present valid data. Instead, Mr. Ossip's recalculation gives equal weight to reasons which clearly demonstrate actionable confusion (confusion based on the common name, GREAT MINDS) with responses that have nothing to do with anything (e.g. both parties use a cut-out coupon in the

ad or an 800–number). The Court finds that this amounts to a fatal flaw to Mr. Ossip's approach.[7]

### 8. Additional Factor

The Court finds that the quality of the defendant's product and the sophistication of the buyers are not relevant factors in this case. The quality of the defendant's goods becomes an issue mainly in situations involving cheap copies of a competitor's protected goods. *See Sara Lee,* 81 F.3d at 467. Although Unapix's format differs from TTC's format, the Court finds that there is no evidence that Unapix's product is inferior or lacking in quality as compared to TTC's GMWIT. Furthermore, there is no evidence that the consumers of TTC's and Unapix's products are highly-trained professionals or experts in purchasing educational products. *See Perini,* 915 F.2d at 127 (finding that sophistication of the buyer was relevant in a market with extremely sophisticated buyers such as that for construction firms). Thus, the Court does not find that they deserve consideration as sophisticated buyers.

### III. Statute of Limitations/Laches Defenses

### A. Statute of Limitations

The critical question is when TTC's cause of action accrued for purposes of the statute of limitations. Unapix contends that TTC failed to file suit for infringement within the two-year statute of limitations and its claims are time barred. Unapix submits that TTC's cause of action accrued in late 1995 when it discovered IVN's usage of the phrase "Great Minds" and believed that the products were confusingly similar. TTC's counsel did not notify Unapix of TTC's trademark and of Unapix's infringement upon TTC's mark until October 1998. Then, TTC waited an

additional five months thereafter to file the present action. In response, TTC concedes that the two-year statute of limitations applies. However, TTC contends that its action did not accrue until the cause of action was complete, which is when the likelihood of confusion is present. TTC submits that it did not learn that Unapix was selling video tapes bearing the GREAT MINDS mark until May 1998, when TTC's attorney found them for sale on the PBS web site. As it filed this action in April 1999, TTC argues that it is well within the filing period. The Court overrules Unapix's motion for judgment for the reasons which follow.

■■■ The statute of limitations applicable to TTC's federal and common law claims for trademark infringement and unfair competition is two years. *See Unlimited Screw Prods., Inc. v. Malm,* 781 F.Supp. 1121, 1125 (E.D.Va.1991) (stating that claims under the Lanham Act are analogous to fraud claims and Virginia's two-year statute of limitations applies); *see also* VA.CODE ANN. §§ 8.01–249 (Michie 1999 Supp.), 8.01–243(A) (Michie 1992) ("[E]very action for damages resulting from fraud, shall be brought within two years after the cause of action accrues."). Under Virginia law, a cause of action is deemed to accrue when a cause of action is complete. *See Locke v. Johns–Manville Corp.,* 221 Va. 951, 957, 275 S.E.2d 900, 904 (1981) (stating that a cause of action does not arise for statute of limitations purposes until the essential elements of a cause of action are present).

■■■ Under trademark law, a cause of action is complete when, on all the facts and circumstances, a plaintiff concludes or should conclude that a likelihood of confusion is present, not merely when a confusingly similar use is uncovered. "[T]he test

**7.** In discussing survey formats for eliciting responses as to confusion, McCARTHY cautions that questions regarding source confusion should be followed with the "Why" question. *See* 5 McCARTHY § 32–175 at 32–261. "Often, an examination of the respondents' verbatim responses to the 'why' question are the most illuminating and probative part of a survey, for they provide a window into consumer thought processes in a way that mere statistical data cannot." *Id.*

of infringement is likelihood of confusion, not just whether the marks themselves are 'confusingly similar.'" 3 McCarthy § 23:4 at 23–14. The plaintiff "has no obligation to sue until 'the likelihood of confusion looms large.'" *Sara Lee*, 81 F.3d at 462 (citation omitted) (adopting McCarthy analysis).

▮ As shown by the discussion, *supra*, the likelihood of confusion analysis requires consideration of a number of factors. Unapix fails to prove that sufficient facts were known to, or should have been known to, TTC which established a likelihood of confusion prior to April 1, 1997. Prior to this time, TTC only knew that a video series entitled "Discovering Great Minds of Science" existed, and had been the subject of a single magazine ad. Mr. Rollins testified that he thought the mark was confusingly similar. After learning of this ad, the company carefully monitored its channels of trade and saw no further marketplace activity, and so concluded that the product was a "flash in the pan." Moreover, IVN used the title "Discovering Great Minds of Science," which is different in meaning and context from GREAT MINDS alone.

All of the critical facts which do in fact establish a likelihood of confusion arose within the statute of limitations period. Unapix first released the initial GREAT MINDS series, "Great Minds of Business" and "Great Minds of Medicine," for broadcast and sale on video in the fall of 1997, less than two years prior to the filing of the present action. Moreover, TTC did not learn that Unapix was selling video tapes bearing the GREAT MINDS mark until May 1998, when TTC's attorney found them for sale on the PBS web site. Unapix's first substantial incursion into TTC's traditional channels of trade occurred in the fall of 1998 when it advertised in two publications in which TTC had historically advertised its GREAT MINDS series.

Furthermore, even if TTC had a viable cause of action that triggered the statute of limitations with respect to IVN's mar-

keting effort in 1995, it would not bar claims against subsequent acts of infringement by Unapix. When a defendant commits multiple wrongful acts, a separate statute of limitations attaches to each wrongful act. *See, e.g., Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California, Inc.*, 522 U.S. 192, 118 S.Ct. 542, 552, 139 L.Ed.2d 553 (1997) (holding that each successive wrongful act carries its own statute of limitation). Omitting the term "Discovering" as the first and most prominent element of the mark involved new, different, and far more extensive uses of TTC's mark, and created new risks of confusion giving rise to new causes of action. *See Kason Indus., Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1206 (11th Cir.1997) (stating that delay in asserting a claim is "excusable" where an alleged infringer first sold different products in different markets through different distribution channels and later came into direct competition with the plaintiff). For these reasons, TTC's claims are not barred by the statute of limitations.

## B. Laches

Unapix also contends that TTC's claims should be barred by the doctrine of laches because TTC slumbered on its rights and delaying the suit was highly prejudicial to Unapix, who has invested time, effort, and money into developing its product.

▮ The estoppel-by-laches defense arises only where the plaintiff has unreasonably delayed its pursuit of a remedy. *See Sara Lee*, 81 F.3d at 462. A senior user has "no obligation to sue until 'the likelihood of confusion looms large.'" *Id.* (citation omitted). In *Sara Lee*, the alleged infringer had been using its confusingly similar mark for ten years. *See id.* at 460. The Court found that despite this extensive time, the use had been in markets other than the plaintiffs and plaintiff's delay in filing the suit did not establish laches. *See id.* at 462; *see also Coco Rico, Inc. v. Fuertes Pasarell*, 738 F.Supp. 613, 619 (D.P.R.1990) ("[A] senior user cannot

be guilty of laches until his right ripens into one entitled to protection."). In this case, the first knowledge of Unapix's videos using the GREAT MINDS mark by TTC was in May 1998, when the sale of the videos was discovered by TTC's attorney on the Internet. Before and after that time, Mr. Rollins testified that the company carefully and continually monitored the advertising vehicles it uses to reach its customers. TTC informed Unapix of the alleged infringement in October 1998 and brought suit in April 1999, less than one year after discovering Unapix's sale of videos. Under these circumstances, the Court finds that TTC's actions were reasonable and laches does not apply.

### IV. Remedy

In light of Unapix's infringement of TTC's GREAT MINDS mark, TTC is entitled to a remedy. TTC seeks both injunctive relief and damages.

#### A. Injunctive Relief

The Lanham Act provides that:

The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under section 1125(a) of this title.

15 U.S.C. § 1116(a) (1994).

■ The equitable remedy of an injunction is not generally granted unless the remedy at law, or monetary damages, is inadequate. See 5 McCARTHY § 30–1 at 30–6. If a defendant has been found to be committing acts which constitute unfair competition, there is little doubt that money damages are inadequate to compensate for continuing harm. See id. Irreparable injury necessary for injunctive relief regularly follows from trademark infringement. See Lone Star, 43 F.3d at 939. Otherwise, the denial of an injunction forces the plaintiff to suffer continued infringement and to bring successive suits for monetary dam-

ages. See Foxtrap, Inc. v. Foxtrap, Inc., 671 F.2d 636, 639–640 (D.C.Cir.1982) (holding that the federal registrant was entitled to enjoin the junior user of the mark where both parties operated social establishments and the junior user had an awareness of the registrant's mark) (citation omitted). Injunctive relief should not be awarded except in the area actually penetrated by the alleged infringer. See Pizzeria Uno, 747 F.2d at 1536 (affirming the district court's denial of injunctive relief because the plaintiff restaurant's had not "penetrated" the area where the defendant's restaurant operated).

■ In this case, Unapix and Plaintiff are operating within the same market. Both TTC and Unapix sell their audio and video tapes on a national level and use national publications for the purposes of advertising. Furthermore, Dr. Jacoby's study regarding likelihood of confusion created by Unapix's use of GREAT MINDS indicated that approximately sixteen percent of those surveyed were confused. Thus, TTC is entitled to a permanent injunction to prevent Unapix from using the mark GREAT MINDS or any confusingly similar mark in connection with its video and audio tapes and related products.

The Court recognizes that Defendant has extensively invested in its product. Unapix has produced and released four separate "Great Minds of ..." series, which have been broadcast on numerous cable and public television stations. Unapix presented evidence that it has entered into cross-marketing arrangements with its business partners and has numerous agreements involving third parties. Furthermore, Unapix has invested great sums in promoting its GREAT MINDS mark. However, the Court finds that Unapix has acted at its own peril by adopting an identical mark without conducting an investigation of the senior use. See 3 McCARTHY § 23:66 at 23–150.

In view of the Court's ruling that Unapix infringed upon TTC's rights to the

GREAT MINDS mark, Defendant Unapix, all of its officers, employees, agents and assigns, and all those persons in active concert or participation, are hereby permanently enjoined from use of the name, terms, or words "Great Minds" and all of its variations in connection with the name and advertisement of its audio and video tapes, books and other products and other forms of media, including electronic presentations of any kind on the Internet.

Unapix must assign to TTC all rights asserted in the pending applications for trademark, which contain the words "Great Minds" or any combination of those words, filed with the United States Patent and Trademark Office.

Defendant must provide new product labels to items held in inventory which bear the mark "Great Minds" and any variation, and to add new labels to them prior to distribution. Defendant is not required to re-film existing inventory to reflect the new product names.

Within thirty (30) days of this order, Defendant is directed to file with the Court and serve on Plaintiff's counsel, a written "Compliance Report," under oath, setting forth in detail the manner and form in which Defendant has complied with the foregoing injunction.

### B. Damages

Section 35(a) of the Lanham Act provides that a prevailing plaintiff is entitled, subject to the principles of equity, to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." See 15 U.S.C. § 1117(a) (1994). TTC asks the Court to use the "defendant's profits" as the measure for recovery instead of its lost sales or other damages.

Unapix contends that TTC must prove that Unapix acted in bad faith, intending to infringe or willfully calculating to exploit the advantage of an established mark, in order for TTC to be entitled to an award of monetary damages. See Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 917 (Fed.Cir.1984). Furthermore, Unapix argues that TTC must also prove

evidence of actual confusion to receive damages. See Conopco, Inc. v. May Dep't Stores Co., 46 F.3d 1556, 1563 (Fed.Cir. 1994). Plaintiff submits that it is unnecessary to prove "actual confusion" or the defendant's bad faith in order to obtain an award of the defendant's profits. See Web Printing Controls Co., Inc. v. Oxy–Dry Corp., 906 F.2d 1202, 1205–06 (7th Cir. 1990) (citing Roulo v. Russ Berrie & Co., Inc., 886 F.2d 931, 941 (7th Cir.1989)); Wynn Oil Co. v. American Way Serv. Corp., 943 F.2d 595, 606–607 (6th Cir.1991) (explaining that actual confusion is irrelevant to an award based on the defendant's profits).

■ A violation of the Lanham Act can be remedied in a variety of ways. A plaintiff who seeks to recover damages must prove a violation, that the violation caused actual confusion among the consumers of the product, and that the plaintiff suffered actual injury. See Web Printing, 906 F.2d at 1204–05. To recover damages, a plaintiff must demonstrate actual confusion. However, where a plaintiff fails to make this showing, other avenues of relief are still available. See id. at 1205. A plaintiff can recover the defendant's profits, an award of costs, and, in some exceptional cases, an award of attorney's fees. See id. These remedies are awarded under a different rationale, including unjust enrichment, deterrence, and compensation. See id.; see also, e.g., Roulo, 886 F.2d at 941 (finding that the district judge's decision to instruct the jury that an award of profits would be appropriate was not an abuse of discretion under the theory of deterrence or unjust enrichment despite the defendant's argument that the plaintiff failed to demonstrate actual damages or actual confusion). A plaintiff can recover the defendant's profits without proving actual confusion. See Roulo, 886 F.2d at 941. In other words, to recover monetary damages, a plaintiff must prove actual confusion; however, to recover a monetary award of the defendant's profits, a plaintiff

need not prove actual confusion. *See Wynn Oil,* 943 F.2d at 607.

In *Wynn Oil,* the Seventh Circuit found that the district court had abused its discretion by refusing to award the plaintiff a recovery based on the defendants' profits. *Id.* The defendants relied upon two cases for supporting their proposition that actual confusion must be shown to justify a monetary award. *See Brunswick Corp. v. Spin-it Reel Co.,* 832 F.2d 513, 525 (10th Cir. 1987); *Schutt Mfg. Co. v. Riddell, Inc.,* 673 F.2d 202, 206 (7th Cir.1982). The court distinguished these cases because neither discussed the "profits" language used in § 1117(a). *See Wynn Oil,* 943 F.2d at 606. "[T]o the extent they [*Brunswick* and *Schutt* ] can be read to require the plaintiff to prove actual confusion before he can recover profits from an infringer, they are contrary to the Supreme Court's reasoning in Mishawaka [sic] and must be disregarded." *Id.* (citing *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 204, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942)); *see also Burger King Corp. v. Mason,* 855 F.2d 779, 781 (11th Cir.1988) (stating that no showing of actual confusion or bad faith is required in support of a claim for recovery of the defendant's profits). For the same reason, this Court finds that Unapix's reliance on *Brunswick* and *Schutt* is misplaced.

As articulated by the Seventh Circuit,

> The Lanham Act specifically provides for the awarding of profits in the discretion of the judge subject only to principles of equity.... "The trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party."

*Roulo,* 886 F.2d at 941 (citation omitted).

An accounting of the profits of the trademark infringer is proper under a theory of unjust enrichment. *See Babbit Elecs., Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1182 (11th Cir.1994). Some courts have found that an award of profits requires a showing that the defendant's actions were willful or in bad faith. *See Bishop v. Equinox Int'l Corp.,* 154 F.3d

1220, 1223 (10th Cir.1998) (citing *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 753 (2d Cir.1996)). *But see Roulo,* 886 F.2d at 941 ("Other than general equitable considerations, there is no express requirement that the parties be in direct competition or that the infringer wilfully infringe the trade dress to justify an award of profits.").

■ Additionally, in determining profits, "the plaintiff shall be required to prove defendant's sales only...." 15 U.S.C. § 1117(a). The defendant, as an infringer, bears the burden of proving any proper costs or deductions from gross revenues to determine profits. *See id.*

> The burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark.... There may well be a windfall to the trade-mark [sic] owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.

*Mishawaka,* 316 U.S. at 206–07, 62 S.Ct. 1022; *see also Wynn Oil,* 943 F.2d at 606.

■ In this case, the Court finds that an award related to Defendant's gross profits is proper for several reasons. First, Defendant was aware of Plaintiff's GMWIT products as of August 14, 1996— prior to the marketing of Defendant's program. As stated previously, Mr. Steve Atlas alerted Mr. Smith of Unapix to the existence of Plaintiff's GMWIT and forwarded a copy of Plaintiff's advertisement. Mr. Atlas specifically questioned the propriety of using "Great Minds" for the series title. Mr. Smith failed to take any affirmative steps to ascertain the propriety of using the name.

Second, after hearing of the potential trademark conflict, Unapix made an intentional business decision to proceed to mar-

ket its series. After speaking with Mr. Atlas, Mr. Smith consulted with the president and the chairman of the board of Unapix. Mr. Smith also called his legal counsel. However, Mr. Smith failed to provide detailed information to allow for informed advice of counsel. In fact, on August 17, 1996, Mr. Smith and Unapix focused in on advertising deadlines and other marketing concerns for its "Great Minds of . . ." series. Unapix intentionally proceeded to sell a new product with the same name of Plaintiff's product without engaging counsel to conduct a full federal and state trademark search of "Great Minds." While the law may not require each new business venture to engage in a full state and federal trademark search, the Court holds that in view of the national advertising of Plaintiff's products in a national publication, prudence required Defendant to conduct a diligent search for trademark issues. "[W]illful ignorance should not provide a means by which [the defendant] can evade its obligations under trademark law." *Tommy Hilfiger*, 80 F.3d at 754 (deciding that the designer's failure to follow the advice of counsel and continued marketing and selling of the infringing mark after notice of a potential trademark violation should have been considered in determining bad faith for recovering an accounting of the defendant's profits).

Third, it should have been readily apparent to Mr. Smith from reviewing the New York Times Book Review section advertisement that Plaintiff's product and Unapix's proposed product were similar in genre and trade channels. Each product is an educational video/audio tape series which is directed toward readers of the New York Times Book Review section and similar publications. Furthermore, at trial, the evidence revealed that Defendant's advertising layouts were very similar in appearance to those of TTC. *Compare Pl.'s Trial Exs.* 71, 131, *with Def.'s Trial Exs.* 5, 6.

Fourth, Plaintiff presented credible consumer survey evidence gathered in a reliable fashion demonstrating a sixteen percent actual consumer confusion rate between the source of Plaintiff's products and Defendant's products. Actual direct consumer confusion evidence was not presented to the Court, however, the Court is persuaded by the totality of the evidence that actual confusion of the source of origin of these products exists in the marketplace.

Fifth and finally, Mr. Smith and Unapix were well aware that the term "Great Minds" had commercial significance as a trademark. While preparing to take its products to market, Unapix initiated a trademark search in order to make its claim for the mark (not to ascertain the rights of any predecessor use of the mark). On August 21, 1996, Mr. Smith and Unapix received a trademark search report which revealed an application for trademark filed by IVN in March 1996. Unapix then entered into contractual arrangements to buy the trademark application. Later, Unapix had its counsel consider sending a cease and desist letter to TTC. Then, Unapix later filed its own trademark applications with the PTO, seeking to acquire rights to the terms for its products. Now, in trial, Unapix takes the remarkable position that the term "Great Minds" is generic and not subject to trademark law protection.

The Court holds that Unapix's conduct in connection with examination of its rights and liabilities was willful and intentional conduct taken in derogation of Plaintiff's rights. *See Tommy Hilfiger*, 80 F.3d at 753. Knowing or willful infringement is more than an accidental encroachment. *See SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 187 (3rd Cir. 1999). Willful infringement involves an intent to infringe or at least a deliberate disregard for the rights of the mark holder. *See id.* Unapix should have shown greater concern for the possibility that it was infringing upon another's mark. Indeed, Mr. Smith after being warned that

ads for a GREAT MINDS product were being run in a major publication did not stop to investigate, but, rather he proceeded to work on his advertising program. His brief telephone call to counsel was not in the nature of advice of counsel sufficient to negate lack of intent. Unapix did not solicit substantive advice from its counsel. No detailed investigation of Plaintiff's claim to the mark or the substance of its business was initiated by counsel. *See Cuisinarts,* 580 F.Supp. at 638.

At trial, Unapix submitted that its costs in producing the "Great Minds of ..." series exceeded its gross revenue, thus, yielding no profits. However, the Court finds that Unapix has failed to sustain its burden of proving the propriety of many of those costs and deductions. Unapix produced Mr. Stewart Ellner, corporate controller, who offered testimony concerning the costs and expenses related to the sale and marketing of the "Great Minds of ..." series. Unapix presented a series of financial statements which reflect that the series has sustained losses. The Court finds that Mr. Ellner's testimony and the financial statements submitted contain several flaws which render them unreliable for deduction of costs. Defendant's exhibits and the other evidence at trial reveal:

(1) prior to this lawsuit, Unapix's business partners had not been provided with royalty statements, *Trial Tr. Vol.* 3 at 96, 100;

(2) in most instances, business partners have not been provided with full royalty payments from Unapix in the amounts claimed in Court, *see id.* at 81–82, 84;

(3) Unapix has stated double charges for international and domestic distribution fees in an amount in excess of $300,000, *see id.* at 78;

(4) revenue projections and royalty statements do not include a charge off of over-head costs to the business partners; *see id.* at 80;

(5) amounts charged to the projects include a fixed percentage for legal and accounting expenses without real reference to time spent or salary costs, *see id.* at 78;

(6) interest costs claimed are not supported by any corroborating verification, *see id.* at 86;

(7) amounts charged for personnel salaries as a percentage are without verification or a basis to assess the number of hours or salary costs, *see id.* at 76–77; and

(8) charges listed for advertising by Einson Freeman were overstated by $12,-500.00, *see id.* at 90–91.

Furthermore, the Court finds that Unapix offered other unreliable financial information. For instance, Unapix allocated excessive overhead expenses to the infringing products. The infringing product constitutes a minute portion of Unapix's sales, and would not have resulted in an increase in Unapix's overhead costs. Additionally, Unapix has included excessive costs for "entertainment" expenses for Mr. Smith, and costs for development of other products which were dropped or not yet completed or released. These costs are not properly deductible. Unapix's improper accounting negates any set-off of expenses. Without critical proof of Defendant's costs, the Court must consider compensation that is just according to the circumstances.

Despite Unapix's discrepancies, the Court finds that Unapix carried its burden of proof of proper costs and deductions in certain areas. Specifically, Unapix's August 30, 1999 Revenue and Expense Report asserted the marketing, production, shipping, and non-capitalized costs for its series. *See Pl.'s Trial Ex. 74.* These costs were not sufficiently rebutted by TTC. The Court accepts the following:

Unapix's "Great Minds of . . ."
Expense Statement

| Costs | Science | Business | Medicine | History |
|---|---|---|---|---|
| Marketing | $ 61,917.37 | $115,455.45 | $ 76,242.04 | $ 29,000.92 |
| Production | $137,156.92 | $262,238.44 | $235,735.95 | $188,419.87 |
| Shipping | $ 1,919.19 | $ 3,707.82 | $ 3,962.97 | $ 1,963.55 |
| Non-capitalized | $ 19,775.69 | $ 11,389.87 | $ 13,670.11 | $ 26.95 |
| Totals | $220,769.17 | $392,791.58 | $329,611.07 | $219,411.29 |

Considering the amounts in relation to the development of each of its series, Unapix has proven $1,162,583.11 in total costs.

The Court finds that it is appropriate to use the gross revenue figures proven at trial less those accepted deductions for purposes of computing damages. *See Maltina Corp. v. Cawy Bottling Co., Inc.,* 613 F.2d 582, 586–587 (5th Cir.1980). Unapix admitted in sworn answers to interrogatories submitted in connection with this case that, as of March 1999, more than seven months ago, it had generated gross revenues in excess of $1.6 million, over approximately 18 months of infringing activity. The Court concludes gross revenues through the date of trial to be $2.0 million. The Court deducts $1,162,583.11, representing the amount of proven costs. Therefore, Defendant's profits from the infringing products are $837,416.89.

The purpose of the award of Defendant's profits here is to compensate Plaintiff for its loss and not to punish Defendant or to provide Plaintiff with a windfall. Rather the award serves to remove the profits from infringement from Defendant. *See Roulo,* 886 F.2d at 941. In this case, the infringement occurred in connection with the sale of products containing Plaintiff's protected mark. Therefore, the Court holds that Plaintiff shall recover $837,-416.89 from Defendant. The Court finds that this sum is equitable to compensate Plaintiff for its injury and sufficient to remove the financial incentive Defendant would have to engage in this conduct. *Cf. Polo Fashions, Inc. v. Craftex, Inc.,* 816 F.2d 145, 149 (4th Cir.1987) (finding that when the parties are competitors, the defendant's profits are a rough measure of the plaintiff's damages).

The Court is not persuaded that this is a case where enhancement of the award by multiples is appropriate or necessary because the sum awarded is sufficient compensation for the trademark infringement. *See* 15 U.S.C. § 1117(a). Plaintiff's products sustained some loss as a result of reduced sales from national advertising but not to a degree to exceed the award or warrant increase of the award.

■ As to attorney's fees, such an award is reserved for exceptional cases. *See id.* To be entitled to an award of attorney's fees, TTC must prove that Unapix acted in bad faith in adopting its mark. *See Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.,* 958 F.2d 594, 599 (4th Cir.1992); *see also Cardservice Int'l, Inc. v. McGee,* 950 F.Supp. 737, 742–743 (E.D.Va.1997) (finding bad faith where the defendant's actions indicated an intention to use the registered mark to harm the plaintiff's reputation and ability to do business on the Internet); *Roulo,* 886 F.2d at 942 (stating that the awarding of attorney's fees required a showing of willful infringement and there was no such showing where the defendant sought to make a similar product but made conscious efforts to create elements of dissimilarity). The Fourth Circuit has interpreted bad faith to mean acts that are malicious, fraudulent, deliberate, and willful. *See Scotch Whisky Ass'n,* 958 F.2d at 600. Based on the Court's finding that Unapix intentionally and willfully infringed TTC's trademark, an awarding of attorney's fees is proper. However, the Court will reserve ruling on this issue until it conducts a hearing to consider the reasonableness of Plaintiff's attorney's fees.

Under the circumstances of this case, the Court holds that TTC shall recover from Defendant Unapix the revenue derived from the sales of infringing products in the amount of $837,416.89.

The Clerk is directed to forward a copy of this Order to counsel of record.